## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-cr-00139-BAH** |
| | : | |
| **CHRISTOPHER CARNELL, and** | : | |
| **DAVID WORTH BOWMAN,** | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES' OMNIBUS MOTION IN LIMINE TO PRECLUDE
## IMPROPER DEFENSE ARGUMENTS AND EVIDENCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this omnibus brief arguing motions *in limine* in advance of the trial. The United States offers the authorities and analysis below to promote efficiency and reduce the need to argue objections midtrial. "Motions *in limine* are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Barnes v. D.C.*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Graves v. District of Columbia*, 850 F.Supp.2d 6, 10 (D.D.C. 2011)). For each motion herein, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

## ARGUMENT

I. **Motion *in Limine* to Preclude the Defendants From Seeking Testimony On The Location of Specific Surveillance Cameras.**

Certain topics that could arise at trial, including the exact locations of USCP CCTV cameras, have little to no probative value but would compromise significant security interests if needlessly disclosed to the public. The United States does not intend to elicit any of the below topics in its case-in-chief and, therefore, cross-examination on such topics would be beyond the scope of direct and impermissible. Fed. R. Evid. 611(b). To the extent that the defendants seek to

argue that these topics are relevant and within the scope of the direct examination, the United States requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses. *See Alford v. United States,* 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendants's presentation of evidence and cross-examination of government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See e.g., United States v. Balistreri,* 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds* by *Fowler v. Butts,* 829 F.3d 788 (7th Cir. 2016). Other permissible reasons for limiting cross-examination include preventing harassment, prejudice, confusion of the issues, or repetitive, cumulative, or marginally relevant questioning. *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).

While limiting the defendants' opportunity for cross-examination may implicate the constitutional right to confront witnesses, the Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until a

defendant sufficiently establishes that defense through affirmative evidence presented during his or her own case-in-chief. *See United States v. Lin,* 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol,* 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief); *United States v. Stamp,* 458 F.2d 759, 773 (D.C. Cir. 1971) (finding trial court properly excluded cross examination of government's witness with response to matter only related to an affirmative defense and not elicited through direct exam). Preventing the defendants from exploring these topics will not infringe their Confrontation Clause right because, as shortly explained, such topics have little probative value, and the defendants have more direct ways of making their case.

    A.   <u>The Defendants Should Be Precluded From Questioning Witnesses About The Exact Positions Of Capitol Police Cameras, Introducing Such Evidence Themselves, Or Admitting Capitol Police Maps Of Camera Coverage.</u>

The United States asks the Court to restrict the defendants' presentation of evidence regarding the specific position of U.S. Capitol Police surveillance cameras. To meet its burden of proof at trial, the government will present video evidence from a variety of sources, including Capitol Police surveillance footage.  The Capitol Police maintains an extensive closed-circuit video system which includes cameras inside the Capitol Building, inside other buildings within the Capitol complex, and outside on Capitol grounds.  These cameras captured thousands of hours of footage from the breach of the Capitol and have been instrumental in documenting the events of January 6, 2021.

However, the U.S. Capitol Police's surveillance system also serves an important, and ongoing, function in protecting Congress and, by extension, national security. In particular, the footage from the system is subject to limitations and controls on access and dissemination. *See*

Exhibit 1. To find relevant footage from the Capitol Police's surveillance system and adequately prepare for trial, one would need to use maps which display the locations of the interior and exterior cameras. The government has therefore provided the defense with maps that display these locations. However, due to the sensitive nature of these items, the government seeks an order limiting the defense from probing, during cross-examination, the exact locations of Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, as an exhibit at trial.[1]

Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded in light of the ongoing security needs of the Capitol. The defense can probe what Capitol Police's cameras show, and what they do not, by asking about the general location of each camera. For example, a camera positioned inside the Lower West Terrace tunnel can be described as "inside the tunnel, facing out" without describing its exact height and depth within the tunnel and without showing a picture of the camera. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning. A general description, and the footage from the camera itself, will make clear what the camera recorded and what it did not. Additionally, presenting the map of all Capitol Police cameras would risk compromising these security concerns for no additional probative value: the map contains numerous cameras installed in parts of the Capitol that the defendants did not visit.

Even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger to national security. *See United States v. Mohammed,* 410

---

[1] These maps have been disclosed to the defendants but, pursuant to the terms of the protective order, have been designated Highly Sensitive. Moreover, these maps have been designated as "Security Information" under 2 U.S.C. § 1979 which forbids their use without the approval of the Capitol Police Board.

F. Supp. 2d 913, 918 (S.D. Cal. 2005) (finding that information having broader national security concerns can be excluded under Rule 403 because its tendency to confuse the issues, mislead the jury, create side issues or a mini-trial and can result in undue prejudice that substantially outweighs any probative value). If the map of the Capitol cameras is introduced in this trial, or in any trial, it becomes available to the public. Immediately, anyone could learn about the Capitol Police's camera coverage as of January 6, 2021, and—importantly—could learn about the parts of the Capitol where cameras were not installed. Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. *Id.*

    B.  <u>The Government Requests An In Camera Proceeding To Determine The Admissibility Of Certain Evidence.</u>

If the defense believes that presentation of the exact locations of the Capitol Police cameras is necessary, or that presentation of the Capitol Police map is necessary, the government requests that the Court conduct a hearing in camera to resolve the issue. As noted, in this case, disclosure of certain information could prove detrimental to the Capitol Police's ability to protect members of Congress and could affect our national security. Courts have found such considerations justify ex parte, in camera proceedings. *See United States v. Nixon,* 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles,* 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that in camera . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor,* 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that in camera proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security."); *United States v. Brown,* 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) (same). At any such hearing, the defendants

should be required to make "a proffer of great specificity" regarding the need for the evidence and the scope of their questions. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (requiring such proffer where evidence of defendants's belief might have permissible and impermissible purposes, and careless admission would raise issues under Fed. R. Evid. 403). As such, an in-camera proceeding is appropriate, if the defense believes that presentation of the exact locations of the Capitol Police, or the Capitol Police map itself, is necessary.

## II.    Motion *in Limine* to Preclude Testimony On Specific Secret Service Tactics And Emergency Operations.

The United States also asks the Court to limit the defendants' cross examination of witnesses about specific Secret Service tactics and emergency operations. Among other violations, the defendants are charged with violating 18 U.S.C. § 1752(a)(1) and (2) by knowingly entering or remaining in a restricted building or grounds without lawful authority. That statute defines "restricted buildings or grounds" to include any building or grounds temporarily visited by a person being protected by the Secret Service. 18 U.S.C. § 1752(c)(1)(B). To meet its burden of proof, the government will call a witness to testify that at the time of the Capitol breach, Secret Service agents were on duty to protect Vice President Mike Pence and two of his immediate family members, all of whom were present at the Capitol. This official will further testify about the Capitol breach's effect on the Secret Service's protection of Vice President Pence and his family members.

However, the very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch and, by extension, national security. Thus, the government seeks an order limiting the cross-examination to questioning about the function performed by the Secret Service as testified to on direct exam, in this case protecting the Vice President and his family. The defendants should be specifically foreclosed from questioning the witnesses about the following:

1. Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur; and,

2. Details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees.

Cross-examination of witnesses about these extraneous matters beyond the scope of direct examination should be excluded as irrelevant or unduly prejudicial. The Secret Service's general protocols about relocation for safety, for instance, should be excluded as irrelevant because such evidence does not tend to make a fact of consequence more or less probable. Fed. R. Evid. 401 (defining relevant evidence). Similarly, evidence of the nature of Secret Service protective details is not relevant in this case. The number or type of assigned agents on a protective detail does not alter the probability that the Capitol and its grounds were restricted at the time. None of the other elements to be proven, or available defenses, implicates further testimony from the Secret Service.

As discussed above, even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger of confusion of the issues, mini-trials, undue delay, and waste of time. Broader cross-examination of witnesses about Secret Service protocols could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses.

Finally, if this Court determines that a hearing is necessary to determine the admissibility of testimony by a witness about the Secret Service, the government requests the hearing be conducted *in camera* and *ex parte*. As noted, in this case, disclosure of certain information could prove detrimental to the Secret Service's ability to protect high-level government officials and affect our national security. Courts have found such considerations justify ex parte, in camera proceedings, and as necessary should do so here.

III.     **Motion *in Limine* to Preclude the Defendants' Introduction of Their Own Out-of-Court Statements as Inadmissible Hearsay.**

A defendant's own out-of-court statements are hearsay that cannot be admitted to prove the truth of any matter asserted. Fed. R. Evid. 801, 802. Although the United States may offer the defendants' statements as statements of a party opponent, Fed. R. Evid. 801(d)(2)(A), or other non-hearsay, the defendants have no corresponding right to admit their own statements without subjecting themselves to cross-examination.

Nor does Federal Rule of Evidence 106, the "Rule of Completeness," provide an end-run around the prohibition against hearsay. That rule provides that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Rule 106 directs the Court to "permit such limited portions [of a statement] to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence." *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986). The rule does not "empower[] a court to admit unrelated hearsay." *United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987). "[T]he provision of Rule 106 grounding admission on 'fairness' reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context . . . . In almost all cases we think Rule 106 will be invoked rarely and for a limited purpose." *Sutton*, 801 F.2d at 1369.

In this case, certain of the defendants' statements to be offered by the United States were made using mobile devices in chats that were active over extended periods of time. Rule 106 does not make all statements within these accounts admissible over a hearsay objection, but only those narrow portions that are necessary to "correct a misleading impression." *Sutton*, 801 F.2d at 1368

(quoting Rule 106 advisory committee notes).  By way of analogy, Courts of Appeals have rejected the notion that "all documents contained in agglomerated files must be admitted into evidence merely because they happen to be physically stored in the same file." *Jamison v. Collins*291 F.3d 380, 387 (6th Cir. 2002) (quoting *United States v. Boylan*, 898 F.2d 230, 257 (1st Cir. 1990)).

Accordingly, at trial the Court should reject any effort by the defendants to admit their own out-of-court statements for the truth of the matter asserted or to use the Rule of Completeness as a backdoor to admit otherwise inadmissible hearsay.

## IV.    Motion *in Limine* to Preclude the Defendants from Arguing Entrapment By Estoppel Or Making a Public Authorities Defense.

The United States asks the Court to prohibit the defendants from making arguments or introducing irrelevant evidence that former President Trump or other officials gave them permission to attack the U.S. Capitol, in what are commonly known as "entrapment-by-estoppel" or "public authority" defenses.

Entrapment-by-estoppel and public authority defenses are closely related and derive from a constitutional prohibition against "convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837, at *7 (D.D.C. Dec. 28, 2022) (J. Bates) (quoting *Cox v. Louisiana*, 379 U.S. 559, 571 (1965)). Both defenses are narrow ones, however, and a defendant may succeed on them only if he meets rigorous evidentiary requirements. *See United States v. Alvarado*, 808 F.3d 474, 484-85 (11th Cir. 2015) ("The public authority defense is narrowly defined, however, and a defendants will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."); *United States v. Baker*, 438 F.3d 749, 755 (7th Cir. 2006) ("The [entrapment-by-estoppel] defense is a narrow one."). In particular, to succeed on an entrapment-by-estoppel claim, a defendant must prove:

(1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (C.J. Howell) (quoting *Cox*, 906 F.3d at 1191). This district has articulated a similar four-part analysis for the public authority defense:

[A]n individual (1) reasonably, on the basis of an objective standard, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.

*Sheppard*, 2022 WL 17978837 at *8 (quoting *United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976). Common between these standards is, among other things, that a government official must offer a "state" or "statement" of the law. Moreover, this defense is limited "to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violation the law." *Alvarado*, 808 F.3d at 484-485.

The defendants have not, and cannot, argue that, in urging his supporters towards the Capitol, then-President Trump made a "statement" of law. By now, several courts in this district have considered various defendants' arguments that the President's words immunized their actions on January 6. To the government's knowledge, all these arguments have failed. *See*, *e.g.*, *Sheppard*, 2022 WL 17978837 at *9 (prohibiting defendants from seeking discovery or presenting evidence at trial on entrapment-by-estoppel or public authority defenses); Order at 2, ECF No. 39, *United States v. Thompson*, No. 21-cr-161 (D.D.C. Mar. 23, 2022) (J. Walton) (excluding evidence of former President Trump's statements for all purposes as unduly prejudicial under Fed. R. Evid. 403); *United States v. Grider*, No. 21-cr-022, 2022 WL 3030974, at *4 (D.D.C. Aug. 1, 2022) (J. Kollar-Kotelly) (declining to instruct jury on defense of entrapment by estoppel); *Chrestman*, 525

F.Supp.3d at 33 (noting that an entrapment-by-estoppel defense is "highly unlikely" to succeed and declining to consider it as weighing in favor of granting pre-trial release).

Defendants' efforts to assert an entrapment-by-estoppel defense have uniformly failed, given that, as Judge Bates observed, the defense is available "only when the official's statements or conduct state or clearly imply that the defendant's actions are lawful." *Sheppard*, 2022 WL 17978837 at *9. The key challenge for the defendants is that, as Courts have observed, "President Trump neither stated nor implied that entering the restricted area of the Capitol grounds and the Capitol building or impeding the certification of the electoral vote was lawful." *Id.* Rather:

> [Trump's] speech simply suggests that it would be an act of "boldness" to "stop the steal." Thus, allowing [the defendant's] reliance on these words would be an instance of allowing "following orders, without more, [to] transform an illegal act into a legal one"—something the D.C. Circuit has unequivocally declined to do.

*Id.* (quoting *United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990)).

Similarly, Judge Kollar-Kotelly, in considering an entrapment-by-estoppel argument, noted that "former President Trump's statements did not in any way address the legality of the actions he urged his supporters to take. He did not, for example, assure them that marching along Pennsylvania was 'lawful' or that occupying Capitol grounds was 'permissible.'" *Grider*, 2022 WL 3030974 at *3. In short, then-President Trump did not "actively misle[a]d [the defendants] about the state of the law," because Trump did not make any statement about the law at all. *Id.* at 2 (quoting *Chrestman*, 525 F.Supp.3d at 14).

Yet, even if then-President Trump had made a statement about the law, allowing those statements to immunize the defendants' conduct would raise serious constitutional concerns. As Your Honor observed about another entrapment-by-estoppel defense by a similarly situated

defendants, "No American President holds the power to sanction unlawful actions because this would make a farce of the rule of law." *Chrestman*, 525 F.Supp.3d at 32:

> [N]o President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters. Accepting that premise, even for the limited purpose of immunizing defendants and others similarly situated from criminal liability, would require this Court to accept that the President may prospectively shield whomever he pleases from prosecution simply by advising them that their conduct is lawful, in derogation of his constitutional obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. That proposition is beyond the constitutional pale, and thus beyond the lawful powers of the President.
>
> Even more troubling than the implication that the President can waive statutory law is the suggestion that the President can sanction conduct that strikes at the very heart of the Constitution and thus immunize from criminal liability those who seek to destabilize or even topple the constitutional order. In addition to his obligation to faithfully execute the laws of the United States, including the Constitution, the President takes an oath to "preserve, protect and defend the Constitution." U.S. Const. art. II, § 1, cl. 8. He cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution.

*Id.* at 32–33 (D.D.C. 2021). In other words, to allow an entrapment-by-estoppel or public authority defense based on the President's false statements of law would implicate both the Take Care clause and the presidential oath of office, and more fundamentally question the nature of the rule of law in America.

Although *Chrestman* involved an argument that former President Trump gave the defendants permission to enter the Capitol grounds, the reasoning in *Chrestman* applies equally to any argument that other officials or law enforcement officers gave permission to the defendants to do the same. Just as a President cannot unilaterally repeal laws, no other officials or members of law enforcement could use their authority to allow individuals to enter the Capitol building during a violent riot. As Judge Howell observed, "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and

Order, *United States v. Williams*, No. 21-cr-377, at \*2 (D.D.C. June 8, 2022).

Even if the defendants in this case could establish that an official or officer told them that it was lawful to enter the Capitol grounds or allowed them to do so, the defendants' reliance on any such statement would not be reasonable considering the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F.Supp.3d at 32; *see also Alvarado*, 808 F.3d at 484 (requiring that a defendant's reliance on the assurances of a public official be *reasonable*) (emphasis added). Moreover, the defendants' actions here contradict any argument that he relied on any such statement by law enforcement when he decided to unlawfully enter the Capitol grounds. The defendants should be prohibited from arguing that their conduct was lawful because someone allegedly told them it was.

## V.   Motion *in Limine* to Preclude the Defendants From Arguing That Alleged Inaction By Law Enforcement Officers Made Their Conduct On January 6, 2021 Legal.

In addition to prohibiting arguments that any officials or officers permitted the defendants to enter the Capitol grounds, the Court should bar the defendants from arguing that any failure of law enforcement to act rendered their conduct legal. The same reasoning that applied in *Chrestman* applies here. That is, like the President, a law enforcement officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction. *Chrestman*, 525 F.Supp.3d at 33. An officer cannot shield an individual from liability for an illegal act by failing to enforce the law, nor can an officer ratify unlawful conduct by failing to prevent it.

"Settled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, No. 21-cr-377 at \*3; s*ee also Garcia v. Does*, 779 F.3d 84, 95 (2d Cir. 2015) (en banc) (entrapment-by-estoppel defense rejected after defendants argued that their prosecuted conduct had been implicitly approved by the police but could not show that it was "affirmatively authorized" by the police). The same principles apply

here. The defendants should be prohibited from arguing that their conduct was lawful because law enforcement officers allegedly failed to prevent it or censure it when it occurred.

VI.     **Motion *in Limine* to Preclude the Defendants From Arguing That Their Conduct Was Protected By The First Amendment.**

>       A.   The Area Around the Capitol had been Lawfully Closed and the Defendants had No First Amendment Right to Breach that Restricted Perimeter.

The Court should preclude the defendants from eliciting evidence, arguing, or asking questions that suggest that there was a First Amendment right to protest inside the restricted area around the Capitol on January 6. At trial, the government will show that the Capitol Grounds were restricted that day.   There is no First Amendment right to protest in a restricted area. The government can—and on January 6, 2021—did restrict an area that is a traditional public forum for legitimate government ends. This Court has affirmed that the government may close a public forum in similar circumstances. *See Mahoney v. U.S. Marshals Service*, 454 F. Supp 2d 21, 32-33 (D.D.C 2006) (U.S. Marshals Service did not violate First Amendment by restricting access to sidewalk in front of St. Matthew's Cathedral for Red Mass, even though sidewalk was a traditional public forum).

Other courts have similarly upheld temporary closures of traditional public fora for safety reasons. *See Mahoney*, 454 F. Supp. 2d at 21; *Menotti v. City of Seattle*, 409 F.2d 1113, 1129-1130 (9th Cir. 2005) (finding that an emergency order to close a core area of downtown Seattle to protests during World Trade Organization conference was constitutional in part because its purpose was to maintain and restore civic order); *Marcavage v. City of New York*, 489 F.3d 98, 105 (2d Cir. 2012) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.2d 1212, 1222 (10th Cir. 2007) ("In this case, there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order'); *Bl(a)ck*

*Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (upholding a street closure plan around the Democratic National Convention that made it nearly impossible for groups wishing to demonstrate to do so within sight and sound of delegates).

On January 6, 2021, the United States Capitol Police and the United States Secret Service coordinated to establish a restricted perimeter around the Capitol building that encompassed a portion of the Capitol grounds. That restricted perimeter was for a legitimate government purpose. No member of the public, including the defendants, had a First Amendment right to engage in protest or speech within that restricted area. The Court should therefore enter an order precluding the defendants from arguing to the contrary or stating during *voir dire*, questioning, or opening or closing statements that they were engaged in protected speech or pursuing their "right" to protest at any point when they were on restricted Capitol grounds.

### B. The Defendants' Conduct within the Breached Restricted Perimeter was not Protected by the First Amendment.

The First Amendment to the United States Constitution protects many sacred rights, but the right to engage in the activity of a violent mob is not among them. *Grayned v. City of Rockford*, 408 U.S. 104, 116 ("Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment."). "Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message." *United States v. Gregg*, 226 F.3d 253, 267-268 (3d Cir. 2000). Even conduct which is not outright violent but which physically "obstructs or unreasonably interferes" with official functions of government business loses its First Amendment protection. *Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (finding that a picket demonstration which physically blocked ingress or egress from a courthouse was not protected by the First Amendment); *see also Cox*, 379 U.S. at 555 (physical "cordon" of a street or a public or private building by demonstrators who refused to let anyone pass if they "did

not agree to listen to their exhortations."). Importantly, that some aspect of an individual's conduct was protected by the First Amendment does not negate criminal action for his unprotected conduct because "when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). That is to say that even if a defendant is engaged in speech that is protected, when his actions turn physically obstructive or outright violent, the First Amendment ceases to protect the speech itself because the government has a legitimate interest in preventing or stopping violent conduct. *Id.*; *see also Grayned*, 408 U.S. at 116. These First Amendment principles have been applied and upheld with respect to the January 6 Capitol Riot. *See*, *e.g.*, *United States v. Nordean et al.*, 579 F.Supp.3d 28, 53-55 (D.D.C. 2021) (Kelly, J.) (finding that charges for violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1512(c)(2) withstood constitutional scrutiny).

The defendants' conduct on January 6 was plainly not protected by the First Amendment. *Id.* On January 6, 2021, the defendants joined a riotous mob that had descended upon the Capitol, completely obstructing the flow of people, including the Vice President of the United States and other lawmakers inside, from ingress or egress from the building without the consent of the mob. *Cox*, 379 U.S. at 555; *Johnson*, 390 U.S. at 617. Their actions, as one among many in the mob, had the effect interfering with a federally protected function, that being the protection of the Vice President of the United States. *Id.* After breaching the secured perimeter around the Capitol, the defendants entered the Capitol itself and took photographs and reviewed materials on Senators' desks on the Senate Floor. *Grayned*, 408 U.S. at 116; *Gregg*, 226 F.3d at 267-268. That some of the defendants' conduct early in the day on January 6 was protected by the First Amendment is of no moment in light of their breach of a restricted perimeter and participation in a civil disorder

both outside and inside the U.S. Capitol building:  the moment they engaged in such conduct, the defendants crossed beyond the boundary of conduct protected by the First Amendment. *Id.*; *see also Grayned*, 408 U.S. at 116. Permitting the defendants to argue that their conduct was protected by the First Amendment, in addition to running contrary to well-established law, risks confusing the issues and the jury. Fed. R. Evid. 401. Therefore, the Court should preclude the defendants from raising this defense.

## VII.  Motion *in Limine* to Preclude the Defendants From Arguing in a Manner That Encourages Jury Nullification.

The defendants should be prohibited from arguing or introducing evidence that encourages jury nullification, whether during voir dire or at trial.  As the D.C. Circuit has made clear,

> A jury has no more "right" to find a "guilty" defendants "not guilty" than it has to find a "not guilty" defendants "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983).  Evidence that only serves to support a jury nullification argument or verdict has no relevance to guilt or innocence. *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("No reversible error is committed when evidence, otherwise inadmissible under Rule 402 of the Federal Rules of Evidence, is excluded, even if the evidence might have encouraged the jury to disregard the law and to acquit the defendants").

The government has identified the following subject areas that are not relevant to the issues before the jury and that could serve as an improper invitation for the jury to nullify its fact-finding and conclusions under the law. The Court should preclude any reference to these issues either during voir dire, argument or questioning by counsel, or in the defense case-in-chief.

### A. The Use of Federal Resources and the Volume and Timing of Discovery.

The United States requests that the defendants be precluded from arguing or eliciting testimony regarding the volume, nature, or timing of discovery or the volume and type of federal resources used in the investigation and prosecution of the case. Any attempt by the defendants to comment on discovery or allocation of federal resources is irrelevant and unduly prejudicial. Fed. R. Evid. 401, 402, 403. Instead, such arguments and testimony invite the jury to improperly consider its feelings towards the United States and the government's decision making about how to allocate resources.

### B. Selective Prosecution.

The defendants may claim that they have been unfairly singled out for prosecution because of their political views. But a "selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Regardless of whether alleged discrimination based on political views is a proper basis for challenging the indictment—which the defendants have not claimed to date—it has no place in a jury trial. *See United States v. King*, No. 08-cr-002, 2009 WL 1045885, at *3 (D. Idaho Apr. 17, 2009) ("The Court will therefore exclude any evidence or argument as to selective prosecution at trial."); *United States v. Kott*, No. 3:07-cr-056, 2007 WL 2670028, at *1 (D. Alaska Sept. 10, 2007) (precluding the defendants from educing evidence to support a selective prosecution claim at trial). Rather, such an argument could serve as an improper invitation for the jury to nullify its fact-finding and conclusions under the law; the defendants should therefore be precluded from making it.

C.   The Alleged Offenses' Punishment Or Collateral Consequences of Conviction.

The defendants may face prison time if they were to be found guilty in this case, and they should not be permitted to arouse the jury's sympathy by introducing any evidence of or attempting to argue about the hardships of prison or the potential effect of incarceration on their families or employment prospects.

It is settled law that the jury should not consider such penalties in reaching its verdict. *See, e.g.*, *United States v. Reed*, 726 F.2d 570, 579 (9th Cir. 1984) (a defendant's possible sentence "should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused."); *Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should have been admonished that it "had no sentencing function and should reach its verdict without regard to what sentence might be imposed"). Courts in this District often give a jury instruction stating exactly that:

> The question of possible punishment of the defendant in the event a conviction is not a concern of yours and should not enter into or influence your deliberations in any way. The duty of imposing sentence in the event of a conviction rests exclusively with me. Your verdict should be based solely on the evidence in this case, and you should not consider the matter of punishment at all.

D.C. Redbook 2.505. Thus, the above-mentioned issues are irrelevant, and any reference to them would invite jury nullification. *See United States v. Bell*, 506 F.2d 207, 226 (D.C. Cir. 1974) ("evidence which has the effect of inspiring sympathy for the defendants or for the victim . . . is prejudicial and inadmissible when otherwise irrelevant") (internal citation omitted); *United States v. White*, 225 F. Supp. 514, 519 (D.D.C 1963) ("The proffered testimony (which was clearly

designed solely to arouse sympathy for defendant) was thus properly excluded."). As such, they should be excluded.

D. The Defendants' Good Character, Conduct, or Culpability Relative to Other Rioters.

*Character Generally.* The Court should preclude the defendants from arguing or introducing reputation or opinion evidence that the defendants are generous, charitable, family-oriented, religious, or community participants. Evidence that a defendant possesses certain favorable character traits is admissible only when the trait is "pertinent" to the offense charged. Fed. R. Evid. 404(a)(2)(A); *see, e.g.*, *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007); *United States v. Santana-Camacho*, 931 F.2d 966, 967–68 (1st Cir. 1991) (Breyer, C.J.). But the defendants may not provide evidence of possessing a generally good character. *See, e.g.*, *United States v. Hill*, 40 F.3d 164, 168 (7th Cir. 1994) (court properly excluded "classic character evidence offered to prove that [defendant] had a good character and acted in conformity therewith"). Such evidence only promotes jury nullification and is not allowable. *See United States v. Joseph*, 567 F. App'x 844, 849 (11th Cir. 2014) ("[W]hen the district court restricted defense counsel's comments about [defendants]'s honor and social contributions—comments that were part of his jury nullification efforts—the court did not deny [defendant] the opportunity to make a legally tenable argument. Instead, it kept him from making impermissible arguments."). Because none of the above characteristics are relevant to the charged offenses, the Court should exclude any evidence and argument addressing these character traits.

*Specific Instances of Conduct.* The Court should also exclude evidence and argument of specific instances of the defendants' good character, including caring for family members, donations, attending religious services, performing charitable or civic work, or other forms of generosity. Rule 405(b) makes clear that unless a defendants' character or character trait is "an

essential element of a charge, claim, or defense," he may not offer evidence of specific instances of good conduct. Fed. R. Evid. 405(b). Because none of the above instances of good conduct are relevant to an essential element of a charge, claim, or defense in this case, evidence of such should be excluded. *See United States v. Bernard*, 299 F.3d 467, 476 (5th Cir. 2002) (approving court's sentencing instruction that jurors should not "consider the religious views of the defendants"); *Santana-Camacho*, 931 F.2d at 967 (excluding evidence that defendants was a good family man and a kind man because it was not a trait relevant to the offense); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1989) (holding evidence of "bravery, attention to duty, perhaps community spirit" were "hardly 'pertinent' to the [charged] crimes"); *United States v. Morison*, 622 F. Supp. 1009, 10111 (D. Md. 1985) (holding "patriotism" was not a relevant trait to the charged offense).

*Conduct Relative to Others.*  Here, the defendants interfered with a federally protected function on January 6, 2021, and did so by entering a restricted area and joining in the on-going civil disorder therein. The Court should preclude any argument that the defendants' lack of additional criminal actions that day or allegedly helpful acts negate the criminal conduct for which they are charged.  *See United States v. Camejo*, 929 F.2d 610, 612-13 (11th Cir. 1991) (a witness's proffered testimony that a defendants declined to participate in a separate, contemporaneous narcotics conspiracy was an inadmissible "attempt to portray [the defendant] as a good character through the use of prior 'good acts'").  Indeed, such evidence would not be particularly probative of whether the defendants are guilty of the offenses with which they are charged; many Capitol Riot defendants joined the civil disorder while also acting helpfully towards law enforcement at different times on January 6, 2021.  *See, e.g.*, Government Sentencing Submission, *United States v. Fairlamb*, No. 21-cr-120 (D.D.C. Nov. 3, 2021), ECF No. 50 at 14-19 (defendant who offered

police officers water and offered to assist them in leaving the area subsequently shoved and punched another officer).

Evidence of past "good acts" by a defendant is generally not probative unless a defendant is alleged to have always or continuously committed bad acts or engaged in ceaseless criminal conduct. *United States v. Damti*, 109 Fed. Appx. 454, 455-56 (2nd Cir. 2004) (citations omitted). Ceaseless conduct occurs when it is alleged that all the defendant's actions were illegal. *Id*. When that is not alleged and the prosecution can point to specific criminal acts, then evidence of good acts is not probative of the issue of guilt at trial. *Id*. Using specific instances of good acts "to prove lack of intent . . . is not only disfavored, it is not permitted under Rule 405(b)." *United States v. Marrero*, 904 F.2d 251, 259–60 (5th Cir. 1990) (affirming decision to exclude evidence that the defendants "provided more services to some clients than they were actually billed for and that sometimes she rendered services free of charge," which the defendants sought to introduce to show that she did not intend to improperly bill a government agency for medical services).

Even if probative, however, introducing evidence about the defendants' irrelevant conduct risks confusing the issues by inviting the jury to weigh the defendants' culpability relative to other rioters, and ought to be excluded. *See United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001) ("Evidence that is admissible under Rule 404 may nonetheless be excluded under Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"). Any alleged specific good acts by the defendants are not connected to the issues of this case. Introducing evidence of such acts carries an unnecessary risk of distracting the jury by allowing it to decide based, not on whether the evidence showed that the defendants committed the charged crimes, but instead on whether the defendants performed unrelated good deeds.

E.   The Defendants' Claimed Ignorance of the Law.

The Court should exclude evidence and argument from the defendants that they were ignorant of the illegality of the charged conduct. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991). While there is a "narrow exception," *United States v. Brooks*, 681 F.3d 678, 700 n.18 (5th Cir. 2012), that exception is "reserved . . . to limited types of statutory violations involving 'complex' statutes—namely those governing federal tax law and antistructuring transactions." *United States v. Kay*, 513 F.3d 432, 448 (5th Cir. 2007); *see Bryan v. United States*, 524 U.S. 184, 195 (1998).

Because ignorance of the law is not a defense to any of the charged offenses, any evidence and argument that the defendants did not know that the charged conduct was illegal should be excluded as irrelevant, and the defendants should not be permitted to ask witnesses if they knew their conduct was illegal or whether they intended to commit crimes.

**VIII.   Motion *in Limine* to Preclude Introduction of Irrelevant Evidence Surrounding Demonstration Permits Obtained for January 5 and 6, 2021 and other Permissible Demonstration Areas around the U.S. Capitol.**

In other January 6 trials, counsel for defendant Bowman has included as defense exhibits the following: (1) a numbered map of areas on and around the United State Capitol grounds where demonstrations may be permitted and (2) six demonstration permits issued by the United States Capitol Police for January 5 and 6, 2021.  *See, e.g., United States v. Groseclose,* Case No. 21-cr-00311, ECF 71 (Govt Objection to Defendant's Exhibits).  These exhibits purport to show that certain permits were issued permitting demonstrations, but only on parts of the Capitol grounds outside of the restricted area around the Capitol building.  Thus, this evidence is not relevant, has limited to no probative value, and risks confusing the issues and misleading the jury.

Pursuant to Rule 403, "[t]he court may exclude relevant evidence if its probative value is

substantially outweighed by a danger of one or more of the following: … confusing the issues [or] misleading the jury …."  Here, the government expects the defendants may use this evidence to attempt to show that demonstrations were authorized on the Capitol grounds, which—according to the defendants—may explain their reasons for travel to Washington, D.C., and for the crowds present on the Capitol grounds that day.  Ostensibly, this will be relevant to their *mens rea*.

This evidence, offered for the defendants' stated purpose, would raise serious concerns of confusing the issues and misleading the jury, and those dangers substantially outweigh the minimal-to-no probative value of this evidence. This is so for several reasons. First, the government's evidence makes clear that the defendants traveled to Washington, D.C., at least in part to attend the former President's rally, but the former President's rally was on the National Mall and at the Ellipse, not on Capitol grounds. The government is aware of no evidence that the defendants was aware of or planned to attend any of those lawful demonstrations, much less that they traveled to Washington, D.C., to attend them. And even if they had been aware of those demonstrations and had planned to attend them, the government is aware of no evidence that the defendants ever saw or knew about the demonstration permits. Simply put, absent very specific foundation that probably does not exist, and could only come from the defendants' own testimony, those permits are irrelevant. So, at the very least, the defendants should be prohibited from cross-examining the government's witnesses about them.

These permits also risk confusing the issue because the jury might hear that demonstrations were permitted on Capitol grounds and infer, incorrectly, that the demonstrations were permitted inside the area around the Capitol building that was restricted on January 6, 2021. They were not. The permits assign specific areas where the demonstrations may take place, and all of those locations were outside the restricted area.  Indeed, Lieutenant Scott Grossi, one of the U.S. Capitol

Police officials responsible for reviewing permit applications, has testified in prior trials that these demonstrations were permitted outside of the restricted area, and no demonstrations were permitted inside the restricted area. *See, e.g., United States v. Darrell Neely,* Case No. 1:21-cr-642 (JDB), Trial Tr. 5/23/2023 at 377; *United States v. Leo Kelly*, Case No. 21-cr-00708 (RCL), Trial Tr. 5/05/2023 at 173.

The defendants likely will also want to introduce evidence that there were large crowds on the Capitol grounds when the defendants arrived there, including within the restricted area. And, they likely will argue, from that evidence, that they did not see the signs and barriers around the Capitol, and did not know that they were forbidden from entering and remaining in the restricted area. To be clear, the government views this as permissible and appropriate argument, and does not object to it. But the permits do not influence what the defendants saw and heard when they arrived on Capitol grounds. The focus should be on their experience, not on whether other people had permission to gather outside the barriers.

The defendants may argue that the government's argument is hypocritical, here: after all, the government plans to introduce evidence that the area was restricted, which may involve testimony about internal law enforcement decisions the defendants did not know about and barriers that the defendants did not see. But, in addition to proving the defendants' *mens rea*, the government also bears the burden of proving the fact that a restricted area existed and the fact that the defendants were not lawfully permitted to enter it or remain within it. This is why such evidence will be relevant to the government's case. Permits for other protests, outside the restricted area, do not challenge the existence of the restricted area, do not establish any sort of permission to enter it or remain within it, and do not illuminate the defendants' *mens rea*. The evidence will needlessly

risk confusing the jury without adding anything of probative value.  Accordingly, without the appropriate foundation, the Court should preclude the use of this evidence.

## IX.    Motion *in Limine to* Preclude Introduction of the USCP's Operations Plan.

In other January 6 trials, counsel for defendant Bowman also has attempted to introduce evidence relating to an 18-page USCP operations plan dated January 5, 2021.  *See, e.g., United States v. Warner,* Case No. 21-cr-00392-RCL (Proposed Defense Exhibit 103, discussed in ECF No. 309 at 6).  This exhibit is irrelevant, and risks confusing the issues and misleading the jury, and the Court should exclude it under Rule 402 and 403.

In a recent 2023 January 6-related trial, when Attorney West asked the government's Capitol overview witness about the operations plan and the map attached to it, that witness testified that she recognized the operations plan and map as "one of the ops plans" that she saw prior to January 6, 2021, but that she could not be sure if it was "the final ops plan."  *United States v. Warner,* Case No. 21-cr-00392-RCL, 10/17/23 Trial Tr. at 60-61.  That witness further testified that the map attached to the operations plan "was the initial perimeter, which was actually larger than" the actual restricted perimeter in place on January 6, as is depicted in the government's "restricted perimeter aerial photograph" exhibit.  *See id.* (describing the government's exhibit as "the map that we looked at earlier").  After this testimony, the court sustained the government's relevance objection and precluded introduction of the exhibit.  *Id.*

Rather than waste trial time going through the same exercise, this Court should preclude the exhibit's introduction in advance of trial.  Similar to the permitted demonstration exhibits discussed above, the USCP operations plan is not relevant, has limited to no probative value, and risks confusing the issues and misleading the jury, particularly as these defendants entered the U.S. Capitol Building and the Senate Floor.  For these reasons, the operations plan should be precluded.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court grant the requested relief or, if the Court reserves ruling, to consider the above arguments when the relevant issues arise during trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Samantha R. Miller
        SAMANTHA R. MILLER
        Assistant United States Attorney
        New York Bar No. 5342175
        United States Attorney's Office
        For the District of Columbia
        601 D Street, NW 20530
        Samantha.Miller@usdoj.gov

        TIGHE BEACH
        Assistant United States Attorney
        Colorado Bar No. 55328
        United States Attorney's Office
        District of Columbia
        202-252-1788
        Tighe.Beach@usdoj.gov