UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 23-cr-00139-BAH |
| | : | |
| CHRISTOPHER CARNELL and | : | |
| DAVID WORTH BOWMAN, | : | |
| | : | |
| Defendants. | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT CARNELL'S
MOTION FOR COUNTS TWO AND THREE, CHARGED UNDER 18 U.S.C. § 1752

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Opposition to Defendant Carnell's Motion *in Limine* for Counts Two and Three, Charged under 18 U.S.C. § 1752. ECF 42. Defendant Bowman has joined the motion. ECF 49. Generally, Carnell asks "this court to define terms subject to dispute between the parties and to establish the elements of 18 U.S.C. § 1752[.]" ECF 42 at 1. Specifically, Carnell first asks the Court to craft a definition of "otherwise restricted," as used in Section 1752, that requires "evidence of . . . something that physically and objectively defines a perimeter or its boundaries as restricted." *Id.* at 2. Second, he asks the Court to adopt a Section 1752 instruction in line with a recent decision by Judge Nichols in *United States v. Elizalde*, where the government must prove the defendant *knew* the Vice President was visiting the Capitol building. ECF 42 at 2-5 (citing Case No. 1:23-CR-00170 (CJN), 2023 WL 8354932, at *3 (D.D.C. Dec. 1, 2023)). Finally, Carnell requests the Court include a "cause-in-fact" instruction because he asserts a "but-for causation" standard applies with respect to whether Carnell "impeded or disrupted the orderly conduct of Government[.]" *Id.* at 5.

1

As explained below, Carnell's positions have been rejected by courts in this District. Therefore, the jury instructions as given by this Court, including as recently as a November 2023 in *United States v. Oliveras*, Case No. 21-cr-00738, ECF 89, should remain intact.

**I.** **Courts have repeatedly rejected Carnell's requested formulation of the term "otherwise restricted" in Section 1752 as requiring "something that physically and objectively defines a perimeter."**

Carnell first asks the Court to craft a definition of "otherwise restricted," as used in Section 1752, that requires "evidence of . . . something that physically and objectively defines a perimeter or its boundaries as restricted." *Id.* at 2. This position has been rejected by Courts in this District. For example, in July of this year, Chief Judge Boasberg rejected a nearly identical argument on similar facts when denying defendants' motions for acquittal and a new trial:

> [Defendants Price and Ballenger] dispute whether the Capitol grounds they crossed and the part of the Capitol building they entered were "posted, cordoned off, or otherwise restricted" at the time they entered them. Ballenger and Price argue that this phrase implicitly refers to "tangible, material restrictions," and that "police cars with flashing lights" or "noises" do not a restricted area make. The Court declines to adopt this narrow construction of the broad phrase "otherwise restricted." The flash bangs, sirens, blaring alarm, broken glass, and tear gas that Defendants encountered were sufficient to mark the areas they crossed as restricted.
>
> Beyond this, the "bike racks and snow fencing, as well as signage indicating that the area was closed," adequately marked the Capitol grounds and the building within it as restricted. Defendants appear to acknowledge these barriers as material restrictions but maintain that because other rioters had cast them aside by the time Ballenger and Price crossed the Capitol grounds, the area was no longer effectively restricted. Rioters' success in knocking down barriers and doors, however, does not strip an area of its restrictions. . . .
>
> If that did not suffice, Defendants certainly entered a restricted area when they walked into the Capitol building, even under their definition. Their only challenge to that finding is that police were cordoned within, rather than outside, the Senate Wing Door, and that this cordon was not pushing back against the crowd that entered through the breached doorway. . . . That rioters had pushed the additional line of officers within the building further back by the time Defendants entered makes no difference; their cordon made sufficiently clear that entry into the building was forbidden.

2

*United States v. Ballenger*, No. CR 21-719 (JEB), 2023 WL 4581846, at *3 (D.D.C. July 18, 2023) (citations omitted).

Chief Judge Boasberg's reasoning applies with equal force here. The evidence at trial will show, among other things, that after entering the restricted area on Capitol grounds, the defendants climbed through scaffolding on the northwest side of the Capitol. The scaffolding had been erected for the upcoming inauguration of then President-Elect Joseph R. Biden, Jr.



The defendants then walked across the Upper West Terrace and the Northwest Courtyard, where uniformed officers were visibly gathering to protect the Parliamentarian Door (defendants circled in red; officers circled in blue).



The defendants then entered the U.S. Capitol Building, as alarms were blaring, through the Senate Wing Door at approximately 2:23 p.m., after the windows adjacent to that door had been visibly smashed in by other rioters (Carnell is circled in yellow and Bowman is circled in blue).



Once inside, the defendants proceeded to the Crypt area of the Capitol, where they joined the crowd as it overwhelmed the U.S. Capitol Police officers who were attempting to prevent the rioters from entering further into the Capitol. The defendants then traveled into and through the Capitol Rotunda and joined a crowd as it amassed near the Rotunda Door. Carnell chanted with the crowd, "TREASON, TREASON, TREASON," while Bowman stood nearby.

The defendants then entered the Senate chamber and walked onto the Senate Floor at 2:49 p.m. At or around 2:55 p.m., the defendants left the Senate chamber. They were directed to exit the Capitol by uniformed law enforcement officers and left the Capitol through the Senate Carriage Door at 2:56 p.m.

Similar to the Ballenger defendants, this Court should find that the "blaring alarm, [and the] broken glass," not to mention the scaffolding the defendants climbed and the uniformed officers visibly protecting the Capitol, were sufficient to mark the areas they crossed as restricted. *See Ballenger*, 2023 WL 4581846 at *3. Even if the defendants could prove they did not see the "bike racks and snow fencing, as well as signage indicating that the area was closed . . . because

other rioters had cast them aside by the time" the defendants arrived, as Chief Judge Boasberg found, "[r]ioters' success in knocking down barriers and doors, however, does not strip an area of its restrictions." *Id.* Moreover, "[i]f that did not suffice, Defendants certainly entered a restricted area when they walked into the Capitol building[.]" *Id.*

Furthermore, Carnell's conception of "otherwise restricted," taken to its logical conclusion, would hollow out Section 1752 altogether. "As evidenced by the legislative history, the goal of Section 1752 is to provide the fullest protection possible for Secret Service protectees." *United States v. Puma*, 596 F. Supp. 3d 90, 114 (D.D.C. 2022). Yet, the Carnell's theory would allow one person to tear down signage before a riot and enable a flood of unauthorized persons to enter. "[R]ioters cannot simply 'annex' Capitol grounds in such a way as to un-restrict an area by forcing law enforcement's retreat." *United States v. Griffith*, No. CR 21-244-2 (CKK), 2023 WL 2043223, at *5 (D.D.C. Feb. 16, 2023); *cf. United States v. McHugh*, 583 F. Supp. 3d 1, 31-32 (D.D.C. 2022) (opining that the defendant's theory that the Secret Service, not another law enforcement agency, must set up the restricted perimeter "would contravene the statute's manifest purpose: to ensure that federal law criminalizes (and thereby deters) misconduct that may threaten a Secret Service protectee").

This issue is not new. Indeed, it was addressed in *United States v. Couy Griffin*, 21-cr-92-TNM, and is currently on appeal before the Circuit. *See Couy Griffin*, 22-3042 (oral argument heard on December 4, 2023). As previously described in past litigation, Section 1752 was created by the Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, 84 Stat. 1880, 1891-92 (1971). Enacted as part of a bill meant to address the "disturbingly high levels of assassination and political violence" in America, S. Rep. 91-1249, at 2 (1970), Section 1752 was intended to help "[en]sure that the President is fully protected at all times against the isolated deranged individual . . . [and

to] protect the President from organized premeditated attempts on his life." S. Rep. 91-1252, at 6 (1970). Recognizing that "security is of paramount importance when the President is away from the White House," at which point he or she is "most vulnerable," and that it had "become increasingly difficult to maintain the necessary level of security," Congress enacted Section 1752. *Id.* at 6-7. The statute made it a crime to, among other things, "willfully and knowingly enter or remain in . . . any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting, in violation of the regulations governing ingress or egress thereto," 84 Stat. at 1892. The statute delegated to the Secretary of the Treasury authority "to prescribe regulations governing ingress or egress . . . to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." *Id.*

Congress subsequently expanded Section 1752's protections so that they applied to any "other person protected by the Secret Service." Pub. L. No. 97-308, 96 Stat. 1451, 1451 (1982). This change was meant to "extend to all persons protected by the United States Secret Service the same 'zone of protection' authority which presently exists for the protection of the President[.]" H.R. Rep. 97-451, at 1 (1982). Congress later eliminated the references to regulations, making it a crime "willfully and knowingly to enter or remain in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192, 252 (2006).

Most recently, Congress amended Section 1752 as part of the Federal Restricted Buildings and Grounds Improvement Act of 2011, Pub. L. No. 112-98, 126 Stat. 263 (2012). That amendment, which enacted Section 1752 in its present form, was meant "to correct and simplify" the statute. H.R. Rep. No. 112-9, at 1 (2011). It also "clarifie[d] that the penalties in Section 1752

6

of title 18 apply to those who knowingly enter or remain in any restricted building or grounds without lawful authority to do so." *Id.* at 2. Section 1752 thus no longer requires a defendant to have acted "willfully."

Carnell cites no authority for the proposition that an appropriately restricted area may become unrestricted through the unlawful actions of individuals different from those who restricted the area in the first place. Although Section 1752 "says nothing about who must do the restricting," the "relevant phrase appears in the passive voice, implying that *someone* must do the physical posting, cordoning off, or restricting." *United States v. Griffin*, 549 F. Supp. 3d 49, 55 (D.D.C. 2021) (emphasis added); *see also United States v. Andries*, Case No. 21-93 (RC), 2022 WL 768684, at *15 (D.D.C. Mar. 14, 2022) ("[Section 1752] does not say who must restrict the area. . . . [T]his open-ended structure makes policy sense. It extends the law's protection of Secret Service protectees to areas where sufficient physical restrictions may already exist . . . or where partner federal or local authorities are willing to assist with setting restrictions[.]"). And the fact that some person or entity must restrict the area implies that only the same person or entity may de-restrict it. After all, "the power to create implies the power to destroy." *Simmons v. Elizabeth City*, 149 S.E. 375, 376 (N.C. 1929).

As an extension of this argument, there is nothing in the law that supports Carnell's proposed definition of something that "physically and objectively defines a perimeter or its boundaries as restricted." ECF 42 at 2. Section 1752(c) defines "restricted building or grounds" to mean "any posted, cordoned off, or otherwise restricted area" of various places, including "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting[.]" To determine what Congress meant by "otherwise restricted area," this Court "begin[s] by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that

language accurately expresses the legislative purpose.'" *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251, (2010) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)). The court "must enforce plain and unambiguous statutory language according to its terms." *Id.*

The word "restricted" when applied to "an area, building, etc." means "accessible only to certain authorized people." *Restricted (adj.)*, Oxford English Dictionary, *available at* http://www.oed.com. And "otherwise" means "in another way" or "in a different manner." *Otherwise*, Oxford English Dictionary. *See generally United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023) (same). Thus, the plain meaning of Section 1752(c) is that it applies to any area of a building or grounds that is posted, cordoned off, or in another way made accessible only to certain authorized people.

It is thus sufficient under Section 1752(c) for the individual or entity in charge of a location to declare that location may be entered only by some people. The location would then be an "otherwise restricted area"—one "made accessible only to certain authorized people" in a different way than signs or a cordon. If Congress had meant to require "notices placed around the boundaries" (ECF 42 at 2 n. 1), it would have said so directly. Just as a private landowner need not erect a fence or post "no trespassing" signs to declare his land off-limits to visitors, the entity restricting an area under Section 1752 need not delineate the restricted area in any particular fashion. A lack of notice may make it difficult, if not impossible, for the government to prove beyond a reasonable doubt that a defendant *knew* that he was in a restricted area and that he lacked lawful authority to be there. *See* Section 1752(a)(1) ("making it a crime to "knowingly enter[ ] or remain[ ] in any restricted building or grounds without lawful authority"). But it does not mean that the area is not restricted in the first place. Rather, to be restricted, an area simply must be "accessible only to certain authorized people." This "broad interpretation of the statute —

encompassing all forms of [restrictions] — is unambiguous and natural, as confirmed by the 'ordinary, contemporary, common meaning' of the provision's text[.]" *Fischer*, 64 F.4th at 337 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

This understanding of Section 1752 is also consistent with the statute's history and Congress's intent in enacting it. Since it initially enacted Section 1752, Congress has consistently expanded its protections, first by extending it to Secret Service protectees other than the President, then by eliminating the need for a defendant to violate regulations as an element of the crime, and most recently by eliminating the requirement that a defendant act willfully (see *supra* at 21-24). Congress has thus made clear its intent that Section 1752 apply broadly, maximizing the Secret Service's ability to protect the President, Vice President, and others.

A broad reading of "otherwise restricted" is likewise consistent with Congress's intent at the time it originally enacted Section 1752. Congress understood that the President is "most vulnerable" and security "of paramount importance" when "the President is away from the White house[.]" S. Rep. 91-1252, at 6. Congress thus sought to provide the Secret Service with authority to create what it later called a "zone of protection," H.R. Rep. 97-451, at 1, that was not dependent on assistance from local law enforcement, a dependence that had made it "increasingly difficult to maintain the necessary level of security," S. Rep. 91-1252, at 6. The Secret Service's authority to "otherwise restrict[]" an area addressed "the special case of a temporary Presidential visit where flexibility must be maintained," S. Rep. 91-1252, at 2, and where "there w[ould] not be adequate time" for "written public notice," *id.* at 9. Although Congress "anticipated that the Secret Service w[ould], consistent with Presidential security, . . . make such restricted areas known to the public (i.e., by posting or cordoning off)," *id.*, it did not limit Section 1752's applicability to that situation or require public notice, when, for example, it would be inconsistent with Presidential security.

Instead, Congress allowed for an area to be "otherwise restricted," thus providing the Secret Service with the flexibility necessary to ensure the President's safety. Applying the correct understanding of Section 1752, it is evident that the Capitol and its grounds were "otherwise restricted" on January 6.

In arguing that Section 1752 requires some type of "notices placed around the boundaries" (ECF 42 at 2 n. 1), Carnell invokes the "canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008) (*see* ECF 42 at 2). But "'canons of construction are no more than rules of thumb that help courts determine the meaning of legislation. . . . When the words of a statute are unambiguous . . . th[e] first canon is also the last: judicial inquiry is complete.'" *Fischer*, 64 F.4th at 335 (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)). As discussed above, the meaning of the words in question is clear, and thus the Court "'must enforce [the] plain and unambiguous statutory language according to its terms.'" *Id.* at 335 (quoting *Hardt*, 560 U.S. at 251).

In any event, it is unclear why "notices placed around the boundaries" (ECF 42 at 2 n. 1) should be chosen as the "common attribute [that] connects the specific items in [§ 1752(c).]" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). The meanings of both "posted" and "cordoned off" include the common element of limiting access to certain people: "posted" means, among other things, to forbid (property) to trespassers under penalty of legal prosecution, and "cordon off" is a way to ensure that people are not allowed in. In a statute designed to safeguard the President and others, Congress presumably was focused on the common attribute of limited access rather than one—public notice—that serves no protective function. *See generally McDonnell v. United States*, 579 U.S. 550, 568 (2016) ("we look to the context in which the words

appear"); *Fischer*, 64 F.4th at 346 ("the *noscitur a sociis* or associated-words canon . . . requires some context cues indicating that the statutory text should be limited by its company"). By using the specific terms "posted" and "cordoned off" together with "otherwise restricted," Congress made clear that an area is not "restricted" simply because it has boundaries, because certain actions are not allowed within it, or because a person's movements within it are confined. *See Restricted (adj.)*, Oxford English Dictionary (defining "restricted" to include "[l]imited in extend, numbers, scope, or action; confined" and "not allowed to travel freely; confined to a certain area or areas"). Instead, an area is "otherwise restricted" when it is "accessible only to certain authorized people." *Id.*

Nor would this understanding of "otherwise restricted" render the terms "posted" and "cordoned off" superfluous. *See generally McDonnell*, 579 U.S. at 569 (noting "the presumption that statutory language is not superfluous") (quotation marks omitted). Both of those terms include possible definitions that do not incorporate the aspect of limited access. *See Posted*, Oxford English Dictionary ("To fix notices to (a wall, etc.); to put up notices in or around (a site, area, etc.)."); *Cordon*, Oxford English Dictionary ("To enclose with, or to cut *off* with, a cordon . . . Chicago is fairly cordoned by a great chain of mammoth manufacturing plants."). By using the terms "posted, cordoned off, or otherwise restricted" in tandem, Congress made clear that Section1752 applies when access to an area is limited to certain people.

In addition to being demanded by the statute's plain text, this understanding is supported by Section 1752's *mens rea* requirement. When it initially enacted Section 1752, Congress made entry into or remaining within a restricted area a crime only if a person "willfully and knowingly" did so. *See* 84 Stat. at 1892. The statute still requires a person to act "knowingly." Section 1752(a)(1). Thus, the conduct proscribed by Section 1752 is not criminal absent some

form of notice that access to a building or area is restricted. Congress recognized exactly that when it "anticipated that the Secret Service will make every effort . . . to make such restricted areas known to the public," but did not expressly require public notice and instead "provided that one of the elements of the crime is that the person 'knowingly and willfully' violates the restricted area." S. Rep. No. 91-1252, at 9. If some type of public notice setting off the restricted space is necessary to render an area restricted, it is unclear why Congress would need to limit prosecutions to those who knowingly enter or remain in such an area.

Moreover, Carnell's interpretation would lead to absurd results. It would mean that a mob could de-restrict an area, thus endangering Secret Service protectees in the process—precisely what happened here on January 6. It would mean that people on the east side of the Capitol could lawfully push past bike racks and police officers simply because people on the west side of the Capitol had previously destroyed part of the original barrier. And it would mean that a person could enter an area he *knew* to be off limits simply because the signs indicating that restriction had been removed by someone else. Or—most absurdly—by the person himself: if someone tore down "no trespassing" signs or police tape, the area would no longer be demarcated in a manner that clearly sets off the specific area that is off-limits, and the person could then enter it without fear of criminal prosecution despite knowing the area was restricted and he lacked authority to enter. Section 1752 "should not be construed to produce [such] an absurd result." *Ctr. For Biological Diversity v. EPA*, 722 F.3d 401, 411 (D.C. Cir. 2013) (quotation marks omitted).

For all of these reasons, the Court should decline to craft a narrower construction of "otherwise restricted" than the one it has routinely used in other January 6 trials. *See, e.g., United States v. Oliveras*, Case No. 21-cr-00738, ECF 89 at 11.

12

II.    **Carnell's argument regarding a defendant's knowledge of the Vice President's visit should be rejected because it is based upon an outlier among January 6 cases.**

Next, Carnell asks the Court to adopt a Section 1752 instruction in line with a recent decision in *United States v. Elizalde*, No. 23-cr-170 (CJN), 2023 WL 8354932 (D.D.C. Dec. 1 2023), where Judge Nichols held the government must prove the defendant knew the Vice President was visiting the Capitol building. 2023 WL 8354932; *accord United States v. Bingert*, No. 1:21-CR-91-1 (RCL), 2023 WL 3613237, at *1 (D.D.C. May 24, 2023) (same). A substantial number of judges in this District have employed the Section 1752 jury instruction this Court routinely uses, which does not require the government to prove that a defendant knew why the Capitol and its grounds were restricted on January 6, 2021, or the additional fact of the presence of a protected person. Indeed, in response to a jury question, this Court instructed the jury that it did *not* need to find that the defendant knew that the Vice President was visiting to establish the § 1752 offenses. *See United States v. Eicher*, Case No. 22-cr-38 (BAH), ECF 83 at 1 (jury notes); 6/14/23 Trial Tr. 8:7-22. This reading of Section 1752 is correct and, as explained more fully below, the government respectfully submits that the Section 1752 formulations in *Elizalde* and *Bingert*[1] were wrongly decided.

A.  The Text in Question.

For ease of reference, the full text of 18 U.S.C. § 1752 is as follows:

(a) Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building

---

[1] We note, respectfully, that the *Bingert* court did not issue an opinion on the rationale for adopting this alternative instruction. The *Elizalde* court, however, did.

or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or

(4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds;

(5) knowingly and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or operate within or above a restricted building or grounds;

or attempts or conspires to do so, shall be punished as provided in subsection (b).

(b) The punishment for a violation of subsection (a) is—

    (1) a fine under this title or imprisonment for not more than 10 years, or both, if—

        (A) the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm; or

        (B) the offense results in significant bodily injury as defined by section 2118(e)(3); and

    (2) a fine under this title or imprisonment for not more than one year, or both, in any other case.

(c) In this section—

    (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

        (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

        (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

(2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

As relevant here, Carnell is charged with misdemeanor violations of Section 1752(a)(1) (Count Two, Entering or Remaining in a Restricted Building or Grounds) and Section 1752(a)(2) (Count Three, Disorderly or Disruptive Conduct in a Restricted Building or Grounds) for his conduct on January 6, 2021. Carnell argues that to be found guilty of either offense, the government must introduce evidence that he knew that the Vice President would be visiting the U.S. Capitol on January 6 when he entered the restricted area.

B.  Section 1752(a)(1) and Congressional Intent.[2]

"Whether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent." *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (citation omitted). Courts begin with the presumption "that Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct." *Id.* (quotations and citations omitted). Although "[a]s 'a matter of ordinary English grammar,' [courts] normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime,'" *id.* at 2196 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009)), ultimately, "the inquiry into a sentence's meaning is a contextual one." *Flores-Figueroa*, 556 U.S. at 652.

An examination of Section 1752(a)(1) is illustrative. Here, this Court has previously and correctly ruled that a defendant need not have known the specific reason why the Capitol building

---

[2] This issue is part of the appeal in *Griffin*, 22-3042 (D.C. Cir.).

and grounds were restricted on January 6, 2021, to be guilty of violating Section 1752(a)(1). *See Eicher*, Case No. 22-cr-38 (BAH), ECF 83 at 1 (jury notes); 6/14/23 Trial Tr. 8:7-22. Rather, a defendant need only know that (1) he was entering or remaining in a posted, cordoned off, or otherwise restricted area and that he, and (2) he lacked lawful authority to do so. This is made plain if language Congress chose to remove from Section 1752(a)(1), located now in the definition of "restricted building or grounds" from Section 1752(c)(1), is re-inserted into Section 1752(a)(1). The statute then applies to "whoever—

> knowingly enters or remains in any [posted, cordoned off, or otherwise restricted area—(A) of the White House or its grounds, or the Vice President's official residence or its grounds; (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance,] without lawful authority to do so.

§ 1752(a)(1), (c)(1).

Where, as in the version of the statute referenced above, "the modifier 'knowingly' introduces a long statutory phrase, . . . questions may reasonably arise about how far into the statute the modifier extends." *Rehaif*, 139 S. Ct. at 2196 (citations omitted). In addition, in this case, the facts that constitute the offense and that criminalize otherwise innocent conduct are (a) that the defendants knew they were entering or remaining in a "posted, cordoned off, or otherwise restricted area," and (b) that they knew they lacked authority to do so. *See generally Bryan v. United States*, 524 U.S. 184, 193 (1998) ("unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense"). In this way, Section 1752(a)(1) resembles typical trespassing statutes. *See* 3 Wayne R. LaFave, Substantive Criminal Law § 21.2(c) (3d ed. 2022) ("[T]he common requirement of criminal trespass offenses is that the actor be aware of the fact that he is making an unwarranted intrusion, which serves to exclude from criminal liability both the inadvertent trespasser and the trespasser

16

who believes that he has received an express or implied permission to enter or remain.") (quotation marks omitted).

By contrast, there is nothing natural or logical about applying "knowingly" to the types of areas protected by the statute, whether it is the White House grounds, a building restricted in conjunction with an event designated as a special event of national significance, or, as here, a building or grounds where a person protected by the Secret Service is or will be temporarily visiting. Such a construction would defy Congress's intent, and there is no principled limitation on the defendant's proposed interpretation.

Imposing the *mens rea* term of "knowingly" on the entire definitional provision in subsection (c) invites more questions than it answers. Subsection (c)(2), for example, makes additional references to other sections of the U.S. Code that are carried into the definitional subsection by reference. *See* Section 1752(c)(2) ("the term 'other person protected by the Secret Service' means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection"). By the defendant's logic, knowingly should also apply to those referenced sections— including knowledge that the person has not declined Secret Service protection—despite the grammatical – and logical – unwieldiness of such a construction. Congress cannot have intended that result.

There are good reasons to conclude that Congress did not intend to require for conviction that a defendant to know why a particular area is restricted because, for example, "the President or other person protected by the Secret Service is or will be temporarily visiting," or because it is "so restricted in conjunction with an event designated as a special event of national significance." § 1752(c)(1)(B)-(C). First, like jurisdictional elements, these requirements "have nothing to do

with the wrongfulness of the defendant's conduct[.]" *Rehaif*, 139 S. Ct. at 2196. A defendant who enters an area he knows to be restricted, while knowing that he lacks authority to be there, has engaged in wrongful conduct regardless of whether he knows the area is restricted because, for example, a former First Lady or a "distinguished foreign visitor[ ] to the United States" is present. 18 U.S.C. § 3056(a)(3), (6).

Second, such a requirement would run contrary to Congress's intent in enacting "a statute designed to safeguard the President and other Secret Service protectees[.]" *Griffin*, 549 F. Supp. 3d at 57. If the statute "require[s] the Secret Service to somehow be telling people" a protectee is present, that would tend to make the person less safe, not more. *United States v. Couy Griffin*, 21-CR-92 (TNM), Tr. of Bench Trial, Doc. 106, 330-32. It would make no sense for Congress to intend such a narrow application of Section 1752 given the "overwhelming[ ] interest in protecting the safety of [the] Chief Executive." *Wood v. Moss*, 572 U.S. 744, 758 (2014) (quotations and citations omitted). *See generally United States v. Morgan*, 45 F.4th 192, 206 (D.C. Cir. 2022) (explaining that "the ordinary textual understanding of the operation of the word 'knowingly' in criminal statutes . . . is 'a contextual one,' subject to being overcome") (quoting *Flores-Figueroa*, 556 U.S. at 652).

Third, requiring proof that a defendant knew the reason an area was restricted is difficult to square with Congress's elimination of the statute's requirement that the defendant act "willfully." That change was meant to "correct and simplify" the statute, and to "clarif[y] that the penalties in Section 1752 of title 18 apply to those who knowingly enter or remain in any restricted building or grounds without lawful authority to do so." H.R. Rep. No. 112-9, at 1-2. When it eliminated the statute's "willfully" requirement, as noted above, Congress moved the language "any posted, cordoned off, or otherwise restricted area of a building or grounds where the President

or other person protected by the Secret Service is or will be temporarily visiting" from Section 1752(a)(1) to a separate definitional provision. *Compare* 18 U.S.C. § 1752(a)(1) (2011) *with* 18 U.S.C. § 1752(a)(1) (2023). Nothing in this statutory amendment suggests that Congress meant to require the government prove that a defendant knew why an area was posted, cordoned off, or otherwise restricted, or to know specifically that a protectee was or would be present. To the contrary, by eliminating the statute's requirement that a defendant act willfully and moving the relevant language to a separate statutory section, Congress made clear its intent to lower the bar for prosecutions under Section 1752. *See Griffin*, 549 F. Supp. 3d at 56 ("But Congress did lower the mens rea requirement, striking the requirement that a defendant act 'willfully.'").

Under either version, the relevant question is which of the words "'knowingly' modifies[.]" *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022) (citations omitted). For the reasons previously discussed, Section 1752's text, structure, and context support the conclusion that Congress intended to require evidence that defendants knew they were entering or remaining in a "posted, cordoned off, or otherwise restricted area"—words that immediately follow "knowingly" when the definition of "restricted building or grounds" is inserted—and that they lacked lawful authority to be there, but not to make such conduct unlawful only when a defendant knew why the area was restricted—in this case, because of a protectee's presence.

C. *Elizalde.*

The defendant relies primarily on Judge Nichols's decision in *Elizalde*. There, the Court held that the word "knowingly" in 18 U.S.C. § 1752(a)(1) and (2) applied to a separate definitional subsection, 18 U.S.C. § 1752(c)(1)(B), to require proof a defendant knew not only that a location was a "posted, cordoned off, or otherwise restricted area" but that it was such an area "of building and grounds where a person protected by the Secret Service would be visiting." *Id.* at *3 (cleaned

19

up).[3] In doing so, the Court rejected the government's arguments, first stating that, while Congress did intend to protect Secret Service protectees, "concerns about practical enforceability are insufficient to outweigh the clarity of the text." 2023 WL 8354932 at *5 (citations omitted, quoting *Flores-Figueroa*, 556 U.S. at 656.). But the government's interpretation of Section 1752 is not animated by concerns of practical enforceability. Rather, the point is one of Congressional intent, which is the ultimate touchstone of statutory interpretation.

If Congress's aim in passing Section 1752 was to safeguard Secret Service protectees, it is implausible that Congress would have intended the statute to apply so narrowly, requiring public knowledge of a protectee's location for the statute's protections to operate. Moreover, the Court in *Flores-Figueroa*, relied upon in *Elizalde*, emphasized the importance of context to determine *mens rea*. 556 U.S. at 652. The context here differs from *Flores-Figueroa* because Congress did intend to provide additional safeguards for protectees, in part by relaxing *mens rea* requirements but also because text at issue in *Flores-Figueroa* consisted of a single sentence and the "strong textual reasons", *id*. at 650, animating the interpretation in *Flores-Figueroa,* are also absent here.

---

[3] The Court's opinion does not address follow-up questions that then arise (*see supra*): If "knowingly" applies to the existence of a protected person, why would it not also apply to the knowledge that an event is designated as a "special event of national significance"? *See* 18 U.S.C. § 1752(c)(1)(C). If "knowingly" applies to (c)(1) in its entirety, then why would it also not apply to (c)(2), which defines "other person protected by the Secret Service"? Similarly, must the government also prove knowledge that the protectee has not "declined such protection"? *Id.* What about the statutory cross-reference to 18 U.S.C. § 3056? All of these questions circle back to the original inquiry: what was Congress's intent? As discussed above, that intent—to protect designated individuals from harm— in light of the history of the statute and the plain words of the text, was not to impute additional and more stringent requirements onto a general trespass statute. While failing to sufficiently consider evidence of congressional intent, *Elizalde* suffers from the same flaw it incorrectly attributes to the government's reasoning, *see* 2023 WL 8354932 at *3, in that it provides no logical reason for the portion of the definitions it excludes from the reach of the word "knowingly."

Even the *Elizalde* court was required to determine where to limit the reach of the term "knowingly" within Section 1752(c)'s definitions. Given that need, consideration of congressional intent, including as expressed through statutory history, is not only appropriate but necessary in light of *Rehaif*. *See also United States v. Griffin*, 549 F. Supp. 3d 46, 55 (D.D.C. 2021) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 352 (2012) for the propriety of considering statutory history).

The context for the offense construed in *Flores-Figueroa* also differs from Section 1752(a)(1) for textual reasons. And although *Elizalde* invoked certain portions of *Flores-Figueroa*, it failed to fully adopt its analysis and consider textual and grammatical differences with Section 1752. In *Flores-Figueroa*, the statutory language at issue consisted of a single sentence providing that a person who, in the commission of certain predicate crimes, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person," confronted additional penalties. 556 U.S. at 648. The dispute in *Flores-Figueroa* concerned whether the word "knowingly" applied to the sentence's "last three words," *id.* at 650, consisting of the words "of another person." To reach the conclusion that "knowingly" applied to those words, the Court considered not only how a sentence is normally understood "[in] ordinary English," but also the absence of any "special context" for the statute. *Id.* at 652 ("No special context is present here"). Both the word knowingly and the words it was found to modify were contained within the same sentence. And even though it interpreted the statute as a matter of ordinary English grammar, the Court in *Flores-Figueroa* still considered the additional factor of the statute's history (which here supports the government's interpretation).

*Elizalde*, however, failed to consider the meaningful differences between the disputed language in *Flores-Figueroa* and the provisions of Section 1752 at issue here. First, the disputed

application of the term "knowingly" in Sections 1752(a)(1) and (a)(2) to a definition in Section 1752(c)(1)(B), is not limited to the confines of a single sentence (as in *Flores-Figueroa*) or even a single subsection of the same statute. Second, and as explained throughout this filing, Section 1752 not only exists in a special context, but its context also provides a clear showing of congressional intent consistent with this Court's prior ruling on this issue. Section 1752's statutory history differs from the inconclusive legislative history considered in *Flores-Figueroa* and demonstrates a congressional intent that is consistent with this Court's and, before it, *Griffin*'s, ruling. Applying the same analytical steps taken in *Flores-Figueroa* to the different text, provisions, structure, and history of Section 1752 yields a different conclusion, and *Elizalde*'s failure to follow that approach undermines its rationale.

A comparison of the different statutes in each case demonstrates why. Again, *Flores-Figueroa* addressed the provisions of 18 U.S.C. § 1028A(a)(1), which punishes commission of specified offenses where the perpetrator "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." As noted above, the disputed scope of "knowingly" in Section 1028A(a)(1) concerned only other words within the same sentence as the word "knowingly." Section 1752(a)(1), as one contrasting example, addresses an offender who "knowingly enters or remains in any restricted building or grounds without lawful authority to do so[.]" The argument here is not whether knowingly applies to any other word within that sentence but whether and how far it applies to a separate subsection, Section 1752(c)(1)(B). Like Section 1752, Section 1028A is subject to definitions in a separate provision, 18 U.S.C. § 1028(d). Section 1028(d) contains a definition for "means of identification," which is the object of the sentence contained in Section 1028(A)(a)(1); however, that definition, 18 U.S.C. § 1028(d)(7)(A-D) makes no mention of the words "of another person" disputed in *Flores-Figueroa*. No other

definition in Section 1028(d) does so.

Thus, the focus in *Flores-Figueroa* on the ordinary way to interpret a word within a single sentence does not necessarily determine, or even have relevance to, the application of a word to an entirely separate sentence in a separate section of a statute, as presents here. What magnifies this difference and makes it even more significant is the statutory history of Section 1752(a)(1), which formerly contained language that Congress relocated to Section 1752(c)(1)(B), a subsection that does not contain the word knowingly. This relocation, occurring when Congress also changed Section 1752(a)(1)'s *mens rea* from "willfully" to "knowingly," provides strong support for the commonsense conclusion that "knowingly" was not meant to modify the separate definitional section regarding what makes a location a "restricted building or grounds," that is, the presence or future presence of a protectee.

The *Elizalde* decision also does not address the differing text or structure of Sections 1028A(a)(1) and 1752(a)(1). Although it cites *Flores-Figueroa*, it fails to properly adopt its analysis by giving appropriate weight to congressional intent, as shown by the context of Section 1752(a)(1) and its history. When *Flores-Figueroa* is properly applied, the validity is apparent of the often-applied jury instruction for Section 1752(a)(1) and the rulings to have decided this issue in the government's favor.

*Elizalde* also appears to have misconstrued some of the government's arguments. According to the Court, "[t]he government's concession that 'knowingly' modifies 'restricted building or grounds' gives up the ballgame" because the term "restricted building or grounds" cannot have different meanings for the *actus reus* and *mens rea* purposes. 2023 WL 8354932 at *3; *see also id.* at *1 ("The government's proposed reading gives a single term in a single sentence two different meanings, which would be highly anomalous in any circumstance, but especially

here, where Congress expressly defined the term."). Respectfully, this is not accurate.

The government's interpretation does not give the term "restricted building or grounds" two different meanings. Instead, the question is simply what information the defendant has to know to commit an offense. This same analysis was presented in *Morgan*, where the relevant statute applied to "[a] person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce[.]" *See United States v. Morgan*, 45 F.4th 192 (D.C. Cir. 2022) (discussing 18 U.S.C. § 2423(a)). The D.C. Circuit held "that, while section 2423(a) required proof that J.T. in fact was underage (under 18 for purposes of the knowingly clause and under 16 for purposes of the intent clause), the statute did not require proof that Morgan *knew* J.T. was underage." *Id.* at 205 (emphasis added). But the D.C. Circuit did not thereby hold that the phrase "individual who has not attained the age of 18" had two different meanings (a person under the age of 18 for *actus reus* purposes and a person under the age of 16 for *mens rea* purposes).

*Elizalde* attempted to distinguish *Morgan* as *sui generis*. 2023 WL 8354932, at *5 (describing child-sex crime cases as an exception to the general presumption of *mens rea*). But respectfully, in this context, it is not. The ruling in *Morgan* (dealing with child-sex crimes), no differently from *McFadden v. United States*, 576 U.S. 186, 192 (2015) (dealing with narcotics), did not depend—either implicitly or explicitly—on the special nature of the offenses. Rather, the special nature of the offenses helped inform the D.C. Circuit's consideration of Congressional intent when evaluating the scope of *mens rea*. Indeed, *Morgan* is exactly the type of analysis called for here, with the same result – in both cases Congress intended the protection of a specific group of persons, and such intent is evident through ample and known statutory history. Moreover, the "historical tradition" of *Morgan* referenced in *Elizalde*, 2023 WL 8354932 at *5, was borne out of the unique status of certain strict liability sex offenses, not whether all child-sex crimes are a

different type of crime where the word "knowingly" travels less. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 n. 2 (1994). The Court's use of *X-Citement* illustrates the problem: as *Elizalde* recognizes, the Supreme Court previously read a statute targeting the distribution of child pornography to require proof that a defendant knew that a child under 18 was depicted. *See* 2023 WL 8354932 at *6; *X-Citement*, 513 U.S. at 72 n. 2, 73. That was because "[a]ge of minority [] indisputably possesses the same status as an elemental fact because nonobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment." *X-Citement*, 513 U.S. at 72. In other words, the "age of the performers is the *crucial* element separating legal innocence from wrongful conduct." *Id.* at 73 (emphasis added). In this case, not so. One who knowingly and criminally trespasses is already in the wrong – knowledge of an additional fact of a specific protectee's presence does not alter the analysis. Thus, the entire discussion in *Elizalde* about *Morgan* and *X-Citement* relating to child-sex crimes as outliers underscores the textual and legislative analysis that supports the government's position in the first place.

In *Elizalde*, the government took the position that Section 1752(c)(1)'s initial language defining "restricted buildings or grounds" as "any posted, cordoned off or otherwise restricted area" states facts within the scope of Section 1752(a)(1)'s use of the word "knowingly" despite its separate location within the statute. This position, however, contrary to the misconception in *Elizalde*, does not "end the ballgame," *Elizalde*, 2023 WL 8354932 at *3, or provide a basis for extending *scienter* further to even more terms in the definition that follow. A principled reason exists to include the particular portion of the definition that the government agrees the defendant must know to be convicted. The terms "posted, cordoned off, or otherwise restricted area" separate wrongful from innocent acts. Thus, while the separate placement of Section 1752(c) and its length, subsections, and cross-references raise reasonable questions about the reach of Section

1752(a)(1)'s *scienter* requirement, *see Rehaif*, 139 S. Ct. at 2196, different considerations apply to elements that criminalize otherwise innocent conduct. For those provisions, a presumption applies that Congress intended a defendant to possess a culpable mental state. *Id.* at 2195. Proof that a defendant knew an area was restricted, that is, "posted, cordoned off, or otherwise restricted" falls within the presumption that criminal statutes require a degree of knowledge sufficient to make "a person legally responsible for his or her act or omission." *Id.* (citing Black's Law Dictionary 1547 (10th ed. 2014)). Accordingly, that portion of Section 1752(c) should sensibly, if not presumptively, apply to the knowledge requirement of Section 1752(a)(1), a statute whose *actus reus* involves "entering or remaining in any restricted building or grounds without lawful authority to do so" because that application further separates wrongful from otherwise innocent conduct.

The Circuit's guidance in *Morgan* also provides a meaningful counterpoint to Judge Nichols's additional concern as described in footnote 1 of the *Elizalde* opinion:

> Under the government's interpretation, a person could "knowingly" enter a § 1752 "restricted building or grounds" even if the grounds are not restricted within the statutory definition. For instance, under the government's view, when one enters a cordoned off site knowing that it is cordoned off, he has not in fact *entered* a "restricted building or grounds" (because the construction site does not meet the statutory definition), yet the person has *knowingly* entered a "restricted building or grounds" (because the site is restricted in a colloquial sense). That strains credulity and the bounds of the English language. The far more natural reading is that "restricted building or grounds" means what its statutory definition says for all purposes, at least absent strong contextual evidence to the contrary.

2023 WL 8354032 at *3 n.1. But the same is true for transporting a minor under § 2423(a). One could "knowingly transport a minor" even if the person is not known to be a minor within the statutory definition because all a defendant needs to know to violate § 2423(a) is that he or she is transporting a person. The same is true with regard to proof that a defendant was distributing a controlled substance in violation of the Controlled Substances Act: for *actus reus* purposes, the government could prove the substance is heroin, while for *mens rea* purposes, the government

26

could prove that the defendant knew "only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules." *See McFadden*, 576 U.S. at 192. This divergence does not mean that the term "a controlled substance" means two different things.

In justifying its analysis, the *Elizalde* court speculated that "Congress may well have acted cautiously to avoid sweeping up conduct that poses little threat to a Secret Service protectee." 2023 WL 8354932 at *5. According to the court, it seemed "unlikely that someone who ends up near a Secret Service protectee by happenstance, without knowing that the protectee is present, is there to cause the protectee harm." *Id.* Indeed, the court believed that Congress "may have written the statute to avoid unnecessarily sweeping up low-risk individuals." *Id.* This unsupported interpretation, as noted in *Griffin*, would essentially require the Secret Service to announce the presence of a protectee, in all circumstances in order to criminalize already wrongful conduct. *See Griffin*, 21-cr-92 (TNM), Tr. of Bench Trial, ECF No. 106, 330-32. This unquestionably would make the protectee less safe and frustrate congressional intent.

Rather than "act[ing] cautiously to avoid sweeping up conduct that poses little threat to a Secret Service protectee," 2023 WL 8354932 at *5, Congress chose to strengthen provisions providing greater safety for protectees.[4] *Id.* Because the statute requires a person to (a) know he is

---

[4] Respectfully, the *Elizalde* court also gave somewhat shorter shrift to the intent assessment required by *Rehaif*. For example, the "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" language previously was in Section 1752(a)(1) itself. *See* 18 U.S.C. 1752(a)(1) (2006) ("(a) It shall be unlawful for any person or group of persons--(1) willfully and knowingly to enter or remain in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"). Under the earlier version of the statute, there undoubtedly was a question as to how far into the statute the "knowingly" requirement applied. Congress cannot have intended to increase the reach of the word knowingly by moving the "restricted area" language to a definition. Under either version, one has to look to Congress's intent to determine what a defendant is required to have known to be convicted.

in a restricted area, and (b) know he lacks authority to be there, elements of a guilty *mens rea* for trespass already are present. In other words, to be guilty, defendants do not end up where they are "by happenstance." *Id.* In order to be convicted, they have to knowingly enter or remain in a restricted area. Thus, *Elizalde*'s emphasis on the "low-risk" individual appears to supplant Congress' intent altogether. *Id.*[5] A person who knowingly disregards a restricted perimeter is exactly the type of person Congress intended to deter or punish.

D. Section 1752(a)(2) and Congressional Intent.

Whether "knowingly" separately travels into (a)(2) requires a completely distinct analysis from (a)(1).

In *Flores-Figueroa*, the Supreme Court reviewed how Section 1028A(a)(1) worked "as a matter of ordinary English grammar." 556 U.S. at 650. Since then, courts have looked at how a

---

[5] The low-risk concern described in *Elizalde* is respectfully misplaced. Someone who knowingly trespasses clearly increases the risk to a protectee, regardless of whether that person knows or does not know of the existence of the protectee. In other words, knowledge of this additional fact does not square with the intent of Congress. For example, imagine a scenario where an armed aggressor mistakenly believes that the U.S. Speaker of the House of Representatives – not a designated protectee under Section 1752 – is at an airport hangar converted into a restricted area, and intends to trespass into the restricted area. But, as it turns out, the person present at the hangar is not the Speaker, but the Vice President. The risk from the armed aggressor, who might shoot before finding (or realizing the absence of) his intended target remains the same, and the *Elizalde* opinion provides no fact-based reason to equate knowledge of a protectee's presence with risk of harm. Moreover, under the government's interpretation of the statute, the person committed a knowing trespass, and that criminal trespass underscores the risk to any protected person. But under *Elizalde*'s reading, that person not only did *not* violate Section 1752(a)(1), but at least by implication, is somehow an innocent bystander. The scenario set forth in *Elizalde* does little to support the idea that Congress intended to narrow protections of protectees to avoid allegedly "sweeping up" a "low-risk" individual in the process. *Id.* Even the converse scenario highlights the problem with *Elizalde*'s scenario; if the decision's hypothetical low-risk individual stumbled into a restricted area knowing a protectee was present, his or her knowledge of the protectee would not necessarily make that individual a greater risk. Simply put, the *Elizalde* scenario does not withstand scrutiny.

statute works grammatically to assess whether any impediment exists to applying "knowingly" to all of the subsequently listed elements of a crime. *E.g., Rehaif*, 139 S. Ct. at 2196.

Although Section 1752(a)(2) differs from Section 1752(a)(1) in significant ways, its differences provide equally compelling reasons not to expand its *scienter* requirements to require knowledge of a protectee's presence or future presence. Section 1752(a)(2) applies to whoever "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions[.]" 18 U.S.C. § 1752(a)(2). The use of the words "when, or so that, such conduct" is an ordinary grammatical break that separates the application of "knowingly" from "such conduct [that] in fact, impedes or disrupts the orderly conduct of Government business or official functions[.]" Thus, the statute does not require that the guilty defendant know that his conduct impedes government business, but requires only that it "in fact" does. Similarly, the use of the phrase "within such proximity to" is an incomplete aside, again suggesting a grammatical stop before "any restricted building or grounds." Again, the statute's grammar and structure do not require that the defendant know the presence of a "protected person." Instead, by setting those clauses apart from the gravamen of the offense, with respect to *mens rea*, Congress required that the defendant (1) knowingly engaged in disorderly or disruptive conduct; and (2) did so with the intent to impede or disrupt Congress's business. With respect to knowledge or intent, nothing more is required.

On this point, too, *Elizalde* fails to differentiate between the statute at issue in *Flores-Figueroa* and the statute at issue here. In *Flores-Figueroa,* the relevant language from Section 1028A(a)(1) consisted of a single and uncomplicated sentence. Here, the dispute over the reach of

"knowingly" in Section 1752(a)(2) once again involves more than one sentence and separate subsections of the same statute. Significantly, the language and grammar within Section 1752(a)(2) is even more complex, with the presence of grammatical breaks that courts have in other circumstances found limit the reach of terms such as "knowingly."

Despite these clear differences from the statute interpreted by the Supreme Court in *Flores-Figueroa*, *Elizalde* adopted analogies that have no application here. Comparing Section 1752(a)(2) to other simple sentences such as, "Smith knowingly transferred funds to the account of his brother", 2023 WL 8354932 at *2, may at least have some superficial similarity to the language of Section 1752(a)(1) (absent reference to the definitions in a separate subsection), but there is no similarity to the text, grammar, or structure of the language in Section 1752(a)(2). The sentence about a bank transfer is not a valid comparator for Section 1752(a)(2).

In addition to grammatical breaks of Section 1752(a)(2), there is an additional reason to limit rather than expand the reach of the word "knowingly." Section 1752(a)(2) has an additional, explicit, and specific intent requirement that Section 1752(a)(1) does not. It requires the specific "intent to impede or disrupt the orderly conduct of Government business or official functions." Because Congress wished to increase the required level of intent for a Section 1752 offense, it did so explicitly and within the subsection establishing the offense, rather than in a separate subsection for definitions. *Compare* Section 1752(a)(5) (explicitly requiring the intent of "knowingly and willfully" operating an unmanned aircraft system with the further intent to "knowingly and willfully" direct or otherwise operate the unmanned aircraft system within or above a restricted building or grounds). The repetition of "knowingly and willfully" within the offense section for Section 1752(a)(5) provides a strong indication that Congress did not, and would not, implicitly establish an intent requirement through a separate definitional subsection. If it wished to make

"knowingly" apply more broadly, Congress would have repeated terms such as "knowingly and willfully" to designate the specific provisions in a Section 1752 offense which required proof of knowledge or intent. The clear drafting of Section 1752(a)(5) counsels against pushing the application of "knowingly" any further into 1752(c) beyond its initial words that are directly relevant to wrongfulness.

No such repetition is present within the definitions contained in Section 1752(c), although Congress was clearly capable of adding, if not repeating, language to require knowledge of a protectee's actual or anticipated presence. It did not do so, which is a further reason to reject the defendant's invitation to adopt *Elizalde*. Indeed, despite the lengthier provisions of Section 1752(a)(2), Congress could have, but did not, elect to repeat the word knowingly to ensure its application to the phrasing at the statute's end. Like the offense addressed in *Morgan*, or the drug offense mentioned in *McFadden*, Section 1752(a)(2) provides an example of an offense requiring proof of a non-jurisdictional fact a defendant is not required to know. Thus, it is hardly a reach to conclude that facts in a separate definitional section do not require proof of knowledge, especially when the particular fact in question has no bearing on the wrongful nature of a defendant's conduct.

In sum, the statute does not require the government to prove that the defendant knew why the Capitol building and grounds were restricted on January 6, or in other words, that a protected person was present.

## III. Carnell's requested but-for causation standard has been routinely rejected by courts in this District.

Finally, Carnell requests the Court include a "cause-in-fact" instruction because a "but-for causation" standard applies with respect to whether Carnell "impeded or disrupted the orderly conduct of Government[.]" ECF 42 at 5. Courts in this District have rejected this assertion, finding the government need not prove a January 6 defendant was the proximate cause, or cause-in-fact,

of the disruption of government business required under Section 1752. For example, in *Ballenger*,

Chief Judge Boasberg disposed of this very argument when the defendants argued "that courts

[must] construe results-based statutory elements to require but-for causation." 2023 WL 4581846

at *7. There, "[t]he upshot, Defendants argue, is that a conviction under § 1752(a)(2) requires that

Government business would not have been impeded or disrupted but for their individual conduct."

*Id.* The court went on as follows:

> Judge Kollar-Kotelly has considered and rejected that argument, explaining that the text of § 1752(a)(2) contains "no language that would suggest but-for causation, such as 'results from' or 'because of.' " United States v. Rivera, 607 F. Supp. 3d 1, 9 n.15 (D.D.C. 2022), aff'd, No. 22-3088, 2023 WL 8594077 (D.C. Cir. Dec. 12, 2023); cf. United States v. Rhine, No. 21-687, 2023 WL 2072450, at *6 (D.D.C. Feb. 17, 2023) ("[T]he presence of other sufficient causes of congressional disruption does not defeat liability under § 1752(a)[(2)]."). The Court is inclined to hew to that analysis (which Defendants have not addressed) and declines to adopt their argument that the statutory phrase "in fact" suggests but-for causation. That term requires at most that Defendants' conduct actually disrupt the proceedings, not that the disruption be traceable solely to them. See In Fact, Black's Law Dictionary (8th ed. 2004) ("Actual or real; resulting from the acts of parties rather than by operation of law"). Indeed, under Defendants' reasoning, no one individual who participated in the riot on January 6 could ever be prosecuted for this offense. The actual-causation gloss Burrage calls for need not apply where, as in this case, "[t]he open-endedness of the statutory language allows" the "adoption of a demanding but still practicable causal standard." Maslenjak v. United States, 582 U.S. 335, 351 (2017).

*United States v. Ballenger*, No. CR 21-719 (JEB), 2023 WL 4581846, at *7 (D.D.C. July 18, 2023)

(citing, in addition, *Burrage v. United States*, 571 U.S. 204, 210 (2014)). For the same reasons,

this Court should decline to adopt a but-for causation standard and should deny Carnell's request

for such a jury instruction.

## **CONCLUSION**

For the above-stated reasons, the United States submits that Carnell's proposed instructions should be rejected, and his motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

TIGHE BEACH
Assistant United States Attorney
Colorado Bar No. 55328
United States Attorney's Office
District of Columbia
202-252-1788
Tighe.Beach@usdoj.gov