UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 23-cr-00139-BAH |
| : | |
| CHRISTOPHER CARNELL and : | |
| DAVID WORTH BOWMAN, : | |
| : | |
| Defendants. : | |

GOVERNMENT'S OPPOSITION TO
DEFENDANT BOWMAN'S MOTION TO SUPPRESS CELL PHONE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Opposition to Defendant David Worth Bowman's Motion to Suppress Cell Phone (ECF 59). The Motion should be denied because Bowman has failed to establish that the seizure and search of his cell phone, pursuant to a valid warrant, was conducted in violation of the Fourth Amendment. That is because the location and items to be searched were described with particularity in the search warrant obtained by legal process, the agents did not coerce Bowman to permit them to enter his residence and provide his phone and passcode, and the search warrant establishes a nexus between the cell phone and Bowman's criminal behavior.

RELEVANT FACTS

**A. Defendants' criminal conduct in and around January 6, 2021.**

David Bowman and Christopher Carnell lived in the Raleigh, North Carolina metropolitan area. On December 21, 2020, Carnell sent a text message to three other individuals: co-defendant David Worth Bowman, Aiden Henry Bilyard,[1] and another person (the "group"). Carnell

---

[1] Defendant Bilyard was convicted by plea agreement of violating 18 U.S.C. § 111(a) and (b) in *United States v. Bilyard*, Case No. 22-cr-00034-RBW.

1

forwarded a message from an individual identified as, "[Name Redacted], Stop the Steal." The message advertised an event planned for January 6, 2021 and stated:

> January 6th is going to be HISTORIC. It's the day We the People will take to the steps of our nation's Capitol and demand they represent us! It's up to us to flood Washington D.C. with Patriots who will loudly tell Congress #DoNotCertify on #Jan6!
>
> Congress has ignored us for far too long, but what they cannot ignore is hundreds of thousands of Patriots rallying outside the halls of Congress. This will send the message that we stand with Rep. Mo Brooks and his colleagues in the House of Representatives.

On January 3, 2021, Carnell texted the group, "January 6 DC trip you guys coming? Me and David are down, we should probably leave earlier this time like 4 am." They then followed through on that plan.

On January 6, 2021, Bowman and Carnell unlawfully entered restricted grounds and the U.S. Capitol Building. Once inside, they eventually made their way onto the Senate Floor. While they were on the Senate Floor, Bowman and Carnell conversed among themselves and with other rioters, and reviewed materials on Senators' desks. Bowman photographed with his cell phone a signed document from Senator Mitt Romney to Vice President Pence, which was a copy of Senator Romney's speech from February 2020, when he voted to impeach then-President Trump. Bowman also posed for photographs while on the Senate floor and stole a paper drink coaster, bearing the seal of the United States Senate, from a desk on the Senate floor.

 

More specifically, while Bowman walked nearby, Carnell looked over the shoulder and discussed documents with a man in a green combat helmet,[2] who was rummaging through documents on a Senator's desk. The individual with the green combat helmet stated, with regard to documents associated with Senator Ted Cruz, "He was gonna sell us out all along—look! 'Objection to counting the electoral votes of the state of Arizona.'"

Carnell then responded, "Wait, no. That's a good thing. He's on our side. He's with us. He's with us."



---

[2] That individual was later identified as Dale Jeremiah ("D.J.") Shalvey. *See United States v. Shalvey*, No. 1:21-cr-334-TJK.

3

At or around 2:55 p.m., Carnell and Bowman left the Senate chamber. They were directed to exit the Capitol by uniformed law enforcement officers and left the Capitol through the Senate Carriage Door at 2:56 p.m. At 4:19 p.m., Carnell sent a text message to the group that stated, "We're safe heading home." Bowman responded with a photoshopped image of himself shaking hands with a social media personality, Nick Fuentes, in front of what appears to be a video game-created version of the Capitol engulfed in flames.



Then, on January 7, 2021, Bowman sent the group an image of the letter from Senator Romney to Vice President Pence that he photographed while on the Senate floor.



On January 8, 202Bowman then wrote "please delete this group text. It would be so funny if you all deleted this as a funny ironic joke." Bilyard responded, "did you get inside? Hypothetically speaking." Another group chat member then sent a computer-generated picture of the U.S. Capitol Building and asked, "did you get inside this cool Minecraft Building?" Bowman replied, "if I was buying textbooks for next semester, I would have hypothetically gotten into the book store and even walk[ed] the checkout floor where all the professors usually buy books and sometimes choose what books their students would read. But no that was just a joke delete the chat because it's funny."

Bilyard then texted the Group, "so what you're saying is that you got into a private library of sorts," to which Bowman responded, "In Minecraft school yes[.] But no[.] Delete all of this for fun."

### B. The FBI's search warrant execution and Bowman's voluntary, non-custodial interview with the FBI.

On November 22, 2022, a warrant was issued pursuant to legal process by the District Court for the Eastern District of North Carolina. The warrant provided that the issuing United States Magistrate Judge had found "probable cause to search and seize the person or property" described in attachments A-1 and A-2 to the warrant. Attachment A-1 included a photograph of Bowman and a description of his likeness. Attachment A-2 included a description of the mobile device to be searched, including the make, model, associated telephone number, and associated IMEI number. The warrant authorized the FBI to search "the person of David Worth Bowman" and his "telephone." Rather than obtain a residential search warrant, the FBI obtained a warrant for Bowman's person because the agents did not know where he lived. Although they had the address contained on Bowman's driver's license, they were unsure whether he resided there or elsewhere, as he had no social media, and they knew from other sources that he was college-aged

and in school. They went to the address on his license simply as their first attempt to find Bowman and to execute the warrant for his phone. The warrant did require that "the agents [ ] not state or otherwise imply that the warrant requires Bowman to provide" a password or biometric information for his phone, and "will make clear that providing any such information is voluntary and that Bowman is free to refuse the request."

On December 2, 2022 at around 12:35 p.m., three FBI agents arrived at the address on Bowman's license to attempt to execute the search warrant for his mobile phone. Although they were aware that Bowman had sent photographs to the Group that showed him possessing firearms, because he had no criminal history and because his actions on January 6 were nonviolent, they determined no extraordinary protective precautions were needed. Therefore, the agents drove an unmarked vehicle and were not in any "raid jackets" or SWAT gear. Instead, they were in plain clothes: one agent wore jeans and a hooded sweatshirt, while the other two agents wore khakis and polo shirts. Although the agents carried firearms, the firearms remained holstered at all times. The agents recorded their entire interaction with Bowman on a wearable recording device. A copy of the recording was provided to the Defendant. *See* Ex. A (a copy of the recording will be uploaded to the Court via USAfx; for ease of review, the government will also provide as Ex. B the FBI 302 summarizing the interview, which includes timestamps of various portions of the conversation). In total, the recorded interaction took place over one hour and twenty minutes. Bowman was 21 years old at the time. He had graduated high school and attended some trade school courses.

The recording begins before the agents left their vehicle to approach Bowman's home and concludes at the end of Bowman's voluntary interview with the agents. At the end of the interview, the agents repeated how much they appreciated Bowman's voluntary cooperation and his "talking to" them. Although Bowman asserts that he "barely spoke above a whisper" throughout the

interview, the recording makes clear that the agents had no problem hearing what Bowman was saying at any point throughout the hour-long interview. Bowman and certain agents are, at times, difficult to hear in the recording, likely due to the distance between them and the wearable recording device – not because Bowman was soft-spoken. The recording reflects a cordial, voluntary, and non-threatening discussion between Bowman and the officers.

As the recording confirms, an agent knocked on Bowman's door, which Bowman answered. While speaking with Bowman at his door, one of the agents clarified that Bowman was not under arrest. Bowman allowed the officers inside. After they were inside, an agent advised Bowman that they had a search warrant for his cell phone. Another agent again assured Bowman that he was not under arrest.

One of the agents then asked Bowman where the cell phone was located and Bowman voluntarily retrieved the phone from another room in his home. An agent asked Bowman if he would unlock the phone and Bowman did. That agent then described reviewing the settings of the phone to confirm that its identifying information, including the make and model, conformed with the mobile phone identified in the search warrant. Another agent started to talk to Bowman about the events of January 6, 2021. Several minutes later, the phone locked and one of the agents asked Bowman for the passcode. Bowman provided the code.

The conversation regarding the events of January 6 then resumed. Throughout the interview, Bowman asked questions, which the agents answered, including questions about the legal process, the warrant, and how the matter would affect his schooling for welding. The officers provided a copy of the search warrant along with one of the FBI agent's business cards, so Bowman or his parents could contact the agent once Bowman had time to speak with his family about the situation. Early in the interview, the agents asked Bowman if he preferred to wait to speak with

them at a time when his parents were available. He chose to continue the interview. When the agents asked Bowman whether "there was a small part" of him that "knew this day was coming," Bowman responded, "I've been dreading this."

As the recording shows, Bowman and the agents then calmly conversed, for approximately an hour, about the Capitol Building, January 6, and the defendants' choices that day. The tone was conversational and, at times, the agents infused levity into the discussion, such as by commenting that at least Bowman, unlike Carnell, did not wear a backpack on January 6 with his name embroidered on it. In addition, Bowman volunteered to the agents that he had taken a paper drink coaster from the U.S. Senate, which he still possessed. Bowman then voluntarily retrieved the coaster from another room in his house, asking if the agents wanted to accompany him as he did so. He provided the coaster to the FBI, and the officers expressed their great appreciation for his candor and voluntary cooperation, a sentiment the FBI agents repeated several times during the interview.

At no point did any of the agents tell Bowman that he had to provide information, including the passcode to his phone, to them or imply that it was required. In fact, as the interview was wrapping up, the agents circled back to the topic of Bowman's phone. Approximately one hour and ten minutes into the recording, the agents revisited the warrant, and asked Bowman whether there was anything illegal or shocking on his telephone, such as child pornography. Bowman responded in the negative. The interviewing agent then stated as follows: "Okay, so we're taking the phone. We're gonna search it – you'll get it back at some point. You provided the PIN, which is great, because that's gonna to make it a lot quicker for us to search."

The agents also noted they would be taking the drink coaster with them, stating, "sorry you're losing your little souvenir here!" Bowman then responded, "you can have it!" The

8

interviewing agent then responded, "Well I am gonna have it, thank you, I'm going to return it, as ridiculous as it might sound, but so be it!" The agents then told Bowman they would be providing him with a receipt for the items seized, reiterated they were leaving a copy of the search warrant, which stated "why we're, what we're doing, what we're looking for," and again reminded him they would leave a business card, stating, "have this conversation with your parents, and then I have an open invitation for your parents to, if they wanna reach out to me, we'll talk about what's going on, what brought us here, and what's gonna happen next." The agent then asked, "do you have any questions on any of this?" Bowman asked about next steps, to which the agent responded that Bowman should hire a defense attorney, to hopefully keep the line of communication open, and that Bowman would likely be facing criminal charges.

Notably, that night, Bowman's mother called the FBI agent who left his business card. During the hour-long telephone call, she made no mention of Bowman having any special needs, autism diagnosis, or anything else that might have made Bowman unable to consent to the interview with the agents.

## ARGUMENT

I. **The search warrant application described with sufficient particularity the person and cell phone to be searched and their "nexus" to criminal activity.**

Initially, suppression is not warranted because the seizure and search of Bowman's phone were conducted pursuant to a valid search warrant supported by particularized probable cause. The Fourth Amendment requires that warrants "particularly describe[]" the "place to be searched" and "things to be seized." U.S. Const. amend. IV. This requirement ensures that a search is "carefully tailored" to avoid a "wide-ranging exploratory search." *Griffith*, 867 F.3d at 1275 (citing *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). Here, the search warrant satisfied the constitutional requirement to describe the individual and cell phone to be searched with particularity when it

9

expressly authorized agents to search for and seize the phone with the listed make, model, associated telephone number, and associated IMEI number from "the person of David Worth Bowman" or "clothing or bags in his immediate control." The search warrant also described Bowman with particularity including a full name, description, and picture.

A search warrant must also demonstrate "a nexus" between the evidence targeted by the warrant and the alleged "criminal behavior." *Griffith*, 867 F.3d at 1271 (citing *Groh*, 540 U.S. at 568); *Warden v. Hayden*, 387 U.S. 294, 307 (1967)). In evaluating whether a sufficient nexus exists, the judge is required to make "a practical common sense decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that [ ] evidence of a crime will be found in a particular place." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (quoting *Gates*, 462 U.S. at 238). "[T]he nature of the item and the normal inferences of where one would likely keep such evidence" may establish a nexus. *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988); *see also Ribeiro*, 397 F.3d at 48.

Bowman appears to argue that the Fourth Amendment warrant clause is directed at the searches of places, rather than the searches of persons. This argument "is simply not supported by history or case law. Warrants may be directed at persons and executed at a location other than the premises also authorized to be searched by the warrant." *See, e.g.*, *United States v. Medina*, No. 1:15-CR-00062 JNP, 2016 WL 3676223, at *3 (D. Utah July 7, 2016) (citing *United States v. Baca*, 480 F.2d 199, 201–03 (10th Cir. 1973) (warrant need not include a specific location because "[a]ny other construction would be wholly unreasonable, for if the defendant saw the officers entering the house at 1927½, he could have avoided a search of his person by merely stepping outside of such house")).

As long as the search warrant describes the particular person to be searched and the issuing magistrate judge found probable cause to connect to the person to the criminal activity, as happened here, the warrant complies with the Fourth Amendment. *See id.* ("Mr. Medina asserts that the police exceeded the scope of the warrant, citing several cases that involve the detention of occupants of premises when police execute a search warrant for such premises. Those cases, however, do not involve instances where officers lawfully requested and received authority to search a particular person. Had the warrant in this case failed to particularly describe the person of Mr. Medina as a place to be searched, his argument may have been persuasive. Similarly, had the command line of the warrant failed to authorize the search of Mr. Medina's person, the result may be different. But these are simply not the facts. The warrant did particularly describe Mr. Medina and expressly authorized the search of his person—separate and apart from the additional authorization to search his home. Because the search warrant authorized the search of Mr. Medina's person and was not limited to his premises, the court finds that the search of Mr. Medina's person was lawful.").

The same is true for warrants that specify both a person to be searched and his mobile device, which is why, for example, law enforcement officers will frequently obtain a "Person Search Warrant" for items expected to be found on a defendant, such as his cell phone. *See, e.g., United States v. Scafidi*, No. 22-CR-20094, 2022 WL 4091116, at *4 (S.D. Fla. July 28, 2022), *report and recommendation adopted* (Sept. 2, 2022) ("The application for the Person Search Warrant presented ample probable cause that the target of the investigation, Defendant, used a mobile electronic device to commit the alleged child pornography offenses. The application also stated that law enforcement confirmed that the number assigned to that phone was registered to Defendant. When the Person Search Warrant is read with the application for that Warrant, it is

reasonably and clearly understood to authorize the use of Defendant's biometrics to access the Defendant's cell phone.").

Here, the warrant listed the person and vicinity to be searched: "the person of David Worth Bowman" and/or the "clothing or bags in his immediate control." It also provided specific identifying information regarding the mobile device at issue, including the associated make and model, telephone number, and IMEI number. The warrant was obtained after submission of a lengthy sworn affidavit in support, which detailed Bowman's crimes on January 6. That affidavit set forth compelling facts and circumstances to support the issuing judge's reasonable conclusion that Bowman's cell phone would contain evidence of his crimes. For example, the affidavit described a picture of a letter from Senator-Elect Mitt Romney to Vice President Mike Pence that Bowman took with his cell phone while he stood on the floor of the U.S. Senate. Gabbard Aff., ¶ 62. The affidavit described text messages Bowman sent to a group chain, where they discussed getting inside the U.S. Capitol, and where Bowman incriminatingly told the chain to "delete this all for fun." *Id.* ¶ 65. The affidavit also described and provided still images from a video showing Bowman using his phone on the floor of the U.S. Senate. *Id.* ¶ 67. The text messages about January 6, the photos, and videos all combined to establish probable cause that evidence of Bowman's crimes would be found on Bowman's phone, which would be found on his person. Thus, this particularized information successfully avoided a wide-ranging search and was compliant with the Fourth Amendment.[3]

---

[3] Even assuming, *arguendo*, that the Court were to find that the warrant somehow lacked probable cause, the *Leon* good faith reliance exception precludes the Court from applying the exclusionary rule to evidence recovered from the cell phone searches. *United States v. Leon*, 468 U.S. 897, 919 (1984) ("evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment"). Here, Bowman provides no evidence or argument that the affiant knew or should have known that the court-approved warrant did not pass

**II.     Bowman voluntarily allowed the officers into his house and provided his cell phone and its passcode to them.**

The execution of the search warrant, seizure of the phone, and interview of Bowman pass constitutional muster. Whatever Bowman's subjective beliefs, the officers' conduct was objectively reasonable in light of the Fourth Amendment. The recording of the FBI's interaction with Bowman clearly shows that Bowman was not overwhelmed or "seized" by officers when he voluntarily allowed them into his home. *See generally* Ex. A.

Bowman is incorrect when he argues that "the threshold question is Bowman's ability to assess whether or not he could refuse their entrance or the search of his phone." ECF 59 at 17-18. Rather than concentrating on an individual's subjective beliefs or subsequent memories of an interaction with an officer, whether "a person has been seized within the meaning of the Fourth Amendment" turns on whether the suspect's "will [has been] overborne" by "coercive police activity" or "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *Colorado v. Connelly*, 479 U.S. 157, 167, 178 n.2 (1986). Courts look to the objective totality of the

---

constitutional muster. *Id*. at 916-17 ("[W]e discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate … Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions."). Therefore, the warrant falls within the good faith reliance exception. *Id*. at 920 (finding that the exclusionary rule should not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope"). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *United States v. Washington*, 775 F.3d 405, 407 (D.C. Cir. 2014) (quoting *Leon*). In this case, the issuing court's probable-cause determination was technically sound and the agents were entitled to rely on it. "[W]e ordinarily do not suppress evidence seized pursuant to a search warrant unless the warrant affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Cardoza*, 713 F.3d at 659. Simply put, there is nothing about the facts of this case or the facts contained in the warrant (and Bowman identifies nothing) that would render law enforcement's procedure—adhering to a lawfully issued warrant—unreasonable.

circumstances to determine "whether the officer's words and actions would have conveyed" to the person that he was free to leave or end the interaction. *See California v. Hodari D.*, 499 U.S. 621, 628 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). If there is no coercive police activity, a statement is considered voluntary. *Connelly*, 479 U.S. at 167; *Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988). Even if a suspect gives a statement solely as a result of an internal condition, e.g., insanity or intoxication, such a statement "might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum, *see, e.g.,* Fed. Rule Evid. 601," not by the Constitution. *See Connelly*, 479 U.S. at 167.

The allegations made by Bowman here are similar to those rejected by the court in *United States v. Hallford*, 816 F.3d 850 (D.C. Cir. 2016). There, the defendant sought hospitalization for medical issues relating to hemophilia; due to mental health concerns, however, an involuntary psychological evaluation was ordered and he was transferred to a "more secure facility." *Id.* at 853. After discussing with staff members about "Hallford's statements, his behavior, and his medical condition," the agents and Hallford "took a seat at a table" in the secure facility, where the agents interviewed him:

> The agents explained to him that they were not there to arrest him and that he was not 'in trouble.' Before proceeding, the agents asked if they could 'speak to [him] about those statements' he made at George Washington Hospital. Hallford said 'yes.' (Agent Fox testified that if Hallford had said 'No' they would have left.) The agents began the interview with general biographical questions, asking Hallford for his address, date of birth, his marital status and other personal information. Hallford told them he had been arrested in Alabama for writing bad checks, that he had been involuntarily committed before, and that he had abused prescription drugs. . . .
>
> When the agents were satisfied that Hallford posed no threat to any Secret Service protectee, they wound down the interview with several routine questions from the Secret Service interview form. One of the questions was whether Hallford owned firearms. In response, Hallford said he had a .45 caliber handgun, a 12–gauge shotgun, and two .22 caliber rifles. When the agents asked where he had these firearms, Hallford said they were in his home in Alabama. When they asked where in his home, Hallford considered the question for a moment, possibly up to a

14

minute, and then admitted that the firearms were in the car he had driven to the District of Columbia. Saying nothing, Agent Fox stood up and walked out to make a telephone call. While he was doing so, Hallford volunteered to Agent Maher that "there was other stuff in the vehicle that would look bad," such as a container of gasoline, bottles of propane and a Molotov cocktail, or the makings of one. Hallford added that he kept the firearms for self-defense. The agents asked Hallford for permission to search the car when, and if, they found it and to review his medical records. Hallford refused both requests. The agents then ended the interview.

*Id.* at 853–54.

Granting Hallford's motion to suppress, the District Court "found that the agents deceived Hallford and 'snooker[ed him] into an admission of gun possession.'" *Id.* at 858. The D.C. Circuit disagreed and reversed: "[W]e cannot accept the district court's conclusion that Hallford's statements . . . resulted from a 'substantial element of coercive police conduct.' Hallford agreed to the interview. The agents did not pressure him to do so in any way. The interview lasted less than an hour. The setting was not, as in *Miranda* for example, in a police-dominated atmosphere." *See id.* at 858. (citations omitted). "The agents asked straightforward questions in conversational tones, the hospital staff offered him food, and, in general, the agents 'treat [ed] him nicely[.]'" *See id.* (citations omitted). "The agents made no threats or promises to Hallford and he was deprived of no essentials. The district court mentioned that 'the agents never did anything to dispel [Hallford's] belief ... that the interview was required, and that if he was going to leave that hospital, he would need their blessing.' This of course assumes that Hallford had such a belief, which the district court said may be 'true or not.'" *See id.* "Nothing the agents did or said would have caused Hallford to entertain such a belief, if in fact he entertained it. And nothing Hallford did or said suggested to the agents that he was thinking they were his ticket out of the hospital." *See id.* at 859. "The agents were generally aware of Hallford's physical and mental condition before they interviewed him. . . . Even so, 'a defendant's mental condition, by itself and apart from its relation to official coercion,' cannot 'dispose of the inquiry into constitutional

15

'voluntariness.'" *See id.* (citing *Connelly*, 479 U.S. at 164). "And there is strong evidence that Hallford's will was not 'overborne.'" *See id.* "In short, we believe the government carried its burden of proving by a preponderance of the evidence that Hallford's statements were voluntary within the meaning of the Due Process Clause. It follows that the district court erred in suppressing physical evidence derived from his statements." *See id.* (citations omitted).

The same is true here. The officers' presence in Bowman's home, their seizure and search of his cell phone, their use of his passcode, and Bowman's voluntary statement were objectively proper and Bowman has not established entitlement to suppression. The agents did not coerce any consent from Bowman, whether or not he had "a predisposition to comply with requests of authority figures." ECF 59 at 7. They arrived a reasonable time of day, after 12:30 p.m., were not dressed in SWAT gear, and all weapons were holstered. The agents made clear to Bowman from the onset of their interaction that he was not under arrest. Bowman invited the agents in before he was notified of the search warrant. They then sat at the kitchen table, which was not a police-dominated environment. The interaction between Bowman and the officers was calm, conversational, and friendly. Although agents were present and were from law enforcement, nothing else about their interaction with Bowman at his home indicates that he was coerced to let them in or to speak with them.

Bowman now attempts the "wet noodle"[4] approach to the Fourth Amendment, arguing

---

[4] *See, e.g., United States v. Jackson*, Case No. 19-CR-126 (BAH), Hrg Tr. October 10, 2019, at 3-4 ("[U]sing the Fourth Amendment like a wet noodle you throw up on the wall to see if anything sticks doesn't cut it in this court. If you've got a Fourth Amendment challenge that you need to make, you need to articulate the reasons for it so we do not waste anybody's time – the Government's time, my time, anybody else's time.") (emphasis added)

16

that a 2001 autism diagnosis (*see* ECF 59 at 5 n.3 (citing Ex. 5))[5] shows that he was unable to understand the situation that he "knew was coming" and that he "was dreading." He therefore argues that any consent he provided was involuntary. But precedent does not support his argument; at the very least, he has not established any Fourth Amendment violation entitling him to relief. *See, e.g., United States v. Hallford*, 816 F.3d at 858-59. Bowman's 2001 diagnosis does not overcome the totality of circumstances here, which show that an objective officer would conclude that he was capable of providing consent and freely speaking with the officers, and that he did just that. For example, Bowman did not indicate to the agents that his comprehension or faculties were impaired, the agents drew no such conclusion, and Bowman's own mother did not disclose any autism diagnosis when she spoke to the FBI for nearly an hour on the evening of the December 2, 2022 visit. Thus, Bowman has failed to establish he was "seized" or that his statements to the FBI were involuntary.

A similar fact-specific analysis applies to whether a person voluntarily provided the passcode to his cell phone. *See, e.g., United States v. Hearst*, No. 1:18-CR-054-RWS-AJB, 2022 WL 16832834, at *22 (N.D. Ga. Mar. 10, 2022), *report and recommendation adopted*, No. 1:18-CR-54-RWS, 2022 WL 8163946 (N.D. Ga. Oct. 14, 2022). Although interactions with law enforcement are inherently stressful, "[t]he question is whether the officers used coercive tactics or took unlawful advantage of the [ ] situation to obtain the consent." *See id.* The circumstances in *Hearst* are largely analogous to the ones here, except in *Hearst* the co-defendant (Dukes) had been placed under arrest, which the court found "present[ed] a degree of duress[.]" *See id.* Despite being under arrest, the court found "there [was] no evidence that the agents . . . used any more

---

[5] Bowman's Motion states the medical records will be filed as "Exhibit 5," however, the Motion appears to be missing an Exhibit 2, and the copy of the exhibit provided to the government is not identified by a number.

force than necessary to gain entry to the residence, secure it, and arrest Dukes. Although the record is silent as to Dukes' age or education level, he was questioned in his own (and his mother's) home. There is no evidence that law enforcement were brandishing any weapons at him at the time." *See id.* Although the agents knew Bowman's age and that he had obtained a high school degree, he, too, was interviewed at his parents' kitchen table.

In addition, an agent in *Hearst* "described the encounter" as follows: "'I literally said, hey, what's the passcode to your phone, and he gave it to me. I think that at one point I think he mixed up the numbers a little bit, but then he got it right and gave me the passcode.'" *See id.* The exact same circumstance occurred here.

Thus, other than Bowman's age, like the defendant in *Hearst*, Bowman "pointed to no susceptibilities of which the police took advantage. He was not subjected to lengthy interrogation and in fact the entire encounter was brief. All of these circumstances demonstrate that other than the arrest situation itself, the environment was not coercive." *See id.*[6] Bowman plainly welcomed

---

[6] *See also, e.g., United States v. Orozco Ramirez*, No. 1:17-CR-185-LMMAJB01, 2019 WL 2165920, at *9 (N.D. Ga. Apr. 22, 2019), *report and recommendation adopted sub nom. United States v. Ramirez*, 2018 WL 8337421 (N.D. Ga. May 17, 2018) ("Nor does the Court find that the agents engaged in any deceptive conduct in an effort to get Orozco to disclose his passcode. The uncontradicted evidence is that . . . inquiry was made of both Betancourt and Orozco regarding whether there was a third party who could transport Betancourt and the children from the residence; Betancourt did not have a phone number for the person identified but Orozco did; and Orozco was asked to provide the passcode and after he did so, he was handed the cell phone to personally communicate with this third person. There is no evidence that the whole scenario was concocted in order to trick Orozco into divulging his passcode, and the Court finds that there was none."); *United States v. Billings*, No. 2:17-CR-122-NT, 2018 WL 283244, at *6 (D. Me. Jan. 3, 2018) ("Here, Det. Stepnick did not read Mr. Billings his *Miranda* rights, but he did represent that the officers would not talk to Mr. Billings anymore after he requested counsel. This response could reasonably suggest to a suspect that he had a right to counsel and that he had effectively invoked it. Continued questioning therefore had some coercive effect, which I consider in my assessment of voluntariness. In the totality of the circumstances, however, these facts are not sufficient to establish that Mr. Billings's will was overborne. Det. Stepnick otherwise spoke in a calm voice, kept his firearm holstered, invited Mr. Billings to leave while the search took place, and asked Mr. Billings only a few, limited questions. Although the continued questioning of a suspect in a

the agents into the home. Once inside, the agents told Bowman that they had a search warrant for his cell phone. The agents asked if he had his phone with him and Bowman confirmed he did have it in another room. Bowman then voluntarily retrieved the phone from another room, unlocked it, and provided it to the agents. During the cordial conversation with agents, Bowman's phone locked and an agent asked for the passcode - once. Bowman then provided the passcode. Later, the agents essentially thanked Bowman for voluntarily providing them with the PIN, which again conveyed that doing so was voluntary: "Ok, so we're taking the phone. We're gonna search it – you'll get it back at some point. You provided the PIN, which is great, because that's gonna to make it a lot quicker for us to search." Bowman was not under arrest at all, and was repeatedly told so. The agents were not brandishing weapons and the conversation was not in a police-dominated environment. Thus, under the totality of the circumstances, this conduct was constitutional.

---

noncustodial setting who has requested to speak to an attorney warrants scrutiny, I conclude that in this instance the Defendant's will was not overborne and the provision of the passcodes was voluntary.").

These circumstances are readily distinguishable from those in which the Court has determined that a passcode was provided involuntarily. *See United States v. Raymond*, 640 F. Supp. 3d 9, 27 (D.D.C. 2022) (granting motion to withdraw guilty plea where, "In this case, Defendant indicated repeatedly that he needed to consult with counsel (and was unable to do so as his phones had been seized). Moreover, certain statements made by the agents may have made it unclear as to the authority they possessed to compel Mr. Raymond to open his phones, in contrast to other statements indicating they could not compel provision of a passcode. All of these aforementioned concerns lead the Court to conclude that Defendant has identified viable challenges related to the manner in which the warrant was executed and his cell phones were seized, which should have been discussed with him by counsel.") (record citations omitted).

## **CONCLUSION**

For all of the above-stated reasons, the United States respectfully submits that Bowman's Motion should be denied without a hearing.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:   */s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

TIGHE BEACH
Assistant United States Attorney
Colorado Bar No. 55328
United States Attorney's Office
District of Columbia
202-252-1788
Tighe.Beach@usdoj.gov

JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C. 20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov