# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | CRIM. CASE NO: 1:23-CR-00139-001 |
| ) | |
| ) | SENTENCING: JUNE 14, 2024 |
| **CHRISTOPHER CARNELL,** ) | |
| DEFENDANT. ) | |

## SENTENCING MEMORANDUM OF CHRISTOPHER CARNELL

Christopher Carnell is a college student who graduated this May from North Carolina State University. He received a Bachelor of Science Degree in Civil Engineering. Today, he is a different person from the 18 year old boy who entered the Capitol on January 6, wearing a red backpack with his name embroidered on it.

Mr. Carnell accepted responsibility for his participation in the chaos on January 6 and consented to a stipulated trial, while preserving the legal issues that are currently pending before the higher courts. Mr. Carnell also delivered to probation a genuine statement of remorse and regret for his actions. This Court found Christopher guilty of three petty offenses, two class A misdemeanors pursuant to 18 U.S.C. § 1752 that are subject to the Court of Appeals decision in *United States v. Griffin*, and one felony 18 U.S.C. § 1512(c) count, which is subject to the anticipated Supreme Court decision in *Fischer v. United States,* currently pending before the Supreme Court.

Considering: the defendant's youthful age at the time of the offense, his clean record, his remorse and regret, his behavior in the Capitol Building and the facts of his case contextualized other January 6 cases and as contrasted to the Government's position on other political protesters who committed criminal acts prior to January 6, and Mr. Carnell's self-reformation post-January 6— probation for a period of one year is an appropriate penalty for a defendant highly unlikely to re-offend.

The Defense submits the foregoing memorandum in support of Mr. Carnell's position on sentencing factors.

TABLE OF CONTENTS

SENTENCING MEMORANDUM OF CHRISTOPHER CARNELL          1

Table of Contents          3

I. Christopher Carnell, From Boy Scouts to Civil Engineer          4

II. January 6th          6

    A) The Stipulated Trial          6

    B) FBI Interview of Co-defendant Bowman          7

    C) Age at Time of Offense          10

III. Sentencing Guidelines          11

    A) Computing the Guidelines Sentencing Range          12

    B) Sentencing Limitations          14

    C) Sentencing a Youthful Offender          16

IV. Incapacitation, Rehabilitation, Retribution, Restitution, and Deterrence          18

V. Avoiding Sentencing Disparities          25

    A) Only One Person Federally Charged for Protest Misconduct in the Capitol Prior to January 6, 2021          25

    B) DOJ Approach to 2020 Political Riot Cases          29

        i. Portland, Oregon          31

        ii. Seattle, Washington          36

        iii. Minneapolis, Minnesota          39

        iv. Washington, D.C.          40

    C) Disparate Treatment of January 6 Participants          42

    D) Comparison of Mr. Carnell to Other January 6 Defendants          44

    E) Comparison of Mr. Carnell's Case to a BLM Case with a Similar Sentencing Guideline          54

    F) The Government's Sentence Request in Context          55

VI. Appropriate Sentence for this Defendant          56

## I. CHRISTOPHER CARNELL, FROM BOY SCOUTS TO CIVIL ENGINEER

Christopher Carnell was born in Milwaukee, Wisconsin in 2002. He is the oldest brother to two younger siblings. He spent his youth engaged in Boy Scouts and church. His favorite activities included camping, hiking, and reading. He also played soccer for a while and attended the YMCA for physical activities. At age 13, Chris moved to his current home in North Carolina with his family.

Christopher had been a Boy Scout from age 6 through 18. He attended weekly meetings and he served various leadership positions. Chris served as a Patrol Leader, organizing 10 other boys. Chris was also a Troop Guide, mentoring younger Scouts. *See* Defense Exhibit 1, *a letter of recommendation from a troop leader summarizing Christopher's work with the Boy Scouts*.



Within the Boy Scouts, Chris served in the Order of the Arrow, the most prestigious sub-group within the Scouts. As part of this group, Christopher performed community service projects that included preserving the ecosystem, various nature and conservation projects, cleaning parks, maintaining camp sites, and other projects needed by the Scouts.

Chris attends Church every Sunday. He attended Catholic School through 6th grade.



Throughout high school, Chris volunteered with the Cary Teen Council, a youth community service group. He cleaned highways, bagged lunches for the homeless and the elderly, and volunteered to assist with various town events.

Christopher's final year of high school and his first two years of college were restricted due to Covid and he was unable to participate in any service projects. During his third year of college, Christopher was arrested for the underlying offenses. He dedicated his time to finishing his degree and assisting undersigned counsel in his defense.

He graduated college in May of 2024 with a Bachelor of Science Degree in Civil Engineering. "My goal in life is to work as a civil engineer. I want to make the world a better place, not to be a burden. I want to design and build infrastructure that has a real-world impact, to improve the safety of our roads, bridges, and stormwater systems. I've worked very hard over the past three and a half years to learn about these things, to change my life and to become a better person, a productive person," Christopher told his probation officer after graduation. *See* ECF No. 106 at *10.



Mr. Carnell is currently seeking employment and is likely to end up in construction management as his first post-graduation job. His main duties will be to protect the safety of the construction workers while they build.



## II. JANUARY 6TH

### A) The Stipulated Trial

Christopher Carnell, an 18 year old high school graduate came to Washington D.C. on January 6 with his co-defendant friend to attend the Trump rally. He wore a red backpack with his name embroidered on it—a backpack from the national jamboree for Boy Scouts, a backpack that his mother paid for.

The defendant agreed to the facts surrounding his January 6 conduct presented to this Court in his stipulated trial. Nonetheless, some of the facts can benefit from clarification.

- Paragraph 19 of the Stipulated Trial, ECF No. 76-1 at * 12, references a video that was played to the Court showing the defendants entering the Senate chamber.[1] The video is recorded in the center of the Senate floor, with the men closest to the camera having their voices heard on the video discussing sitting in the Vice President's chair. Mr. Carnell is not even in the same room when this conversation starts. In the middle of this conversation, about 20 feet away based on Counsel's approximations, Mr. Carnell and Mr. Bowman begin to enter the Senate Chamber — the two are visible at timestamp 0:24 of The New Yorker video exhibit in evidence, entering through the open doors of the Senate Chamber along with other individuals. From the video it is clear that none of the individuals near the entrance are interacting with 

---

[1] The video was submitted to the Court with the title: "Ex. 19.3 & 20 - Clip of New Yorker Senate Floor Video.mp4"

the men at the center of the floor, the area from which the video is being recorded. Mr.

Bowman and Mr. Carnell do not participate in the conversation referenced in Paragraph

19 at all; nor are they located anywhere near it, nor did they even hear it.[2]

- Paragraph 18 of the Stipulated trial discusses the two co-defendants observing the

    attack on a female journalist. While Mr. Carnell is able to somewhat recall men yelling

    at a female about an SD card, he never personally witnessed any physical assault. He

    cannot speak for his co-defendant or what Mr. Bowman did or did not witness.

    Paragraph 18 is phrased in a manner that joins the two co-defendants as a single

    observer.[3] *See* ECF No. 76-1, *11.

## B) FBI Interview of Co-defendant Bowman

On December 1, 2022, two FBI agents interviewed Chris Carnell's co-defendant, David

Bowman, who was 19 at the time that he entered the Capitol together with Chris Carnell. The

transcript of the relevant portion of the conversation between two FBI agents and Mr. Bowman is

copied below.[4]

FBI Agent (00:44:06):
So were you aware of what was going on earlier that day in the Capitol? Like official
proceeding stuff?

Bowman (00:44:13):
Uh, in the house? I, I, there, there were senators in the other chamber.

---

[2] Defense counsel sought to keep this paragraph out or to rephrase it so as to not confuse the Court, but the
Government insisted on keeping this paragraph as a condition of the Stipulated Trial.

[3] Defense counsel sought to keep this paragraph out or to rephrase it so as to not confuse the Court, but the
Government insisted on keeping this paragraph as a condition of the Stipulated Trial.

[4] While the defendants sought to include Mr. Bowman's conversation with the FBI in the Stipulated Trial, the DOJ
opposed the inclusion.

FBI Agent (00:44:20):
Okay.

Bowman (00:44:22):
Uh, I, I don't even know, I don't know exactly

FBI Agent (00:44:29):
What process. You don't know the legal term or the process, but I don't know the process. But do you understand why they were there or what they were doing?

Bowman (00:44:34):
They were going to determine something that would've been very consequential for Trump.

FBI Agent (00:44:40):
I think you're right. Um, I think you're right.

Bowman (00:44:42):
That's why things were so heated.

FBI Agent (00:44:44):
Yeah. I think you're right. I, I, I too do not know the official legal proceedings, but I think that that was when they were certifying the, the electoral, you know, cuz you understand how elections work with, with, with, we vote for our candidate, but we don't really vote for our candidates, the electoral college that votes. And I think they certify that and they were doing it that day, which is the whole reason why January 6th. Why, why everybody was up there on January 6th. Right?

Bowman (00:45:13):
Yeah.

FBI Agent (00:45:13):
So when you went in the Senate chambers, were you just kind of being a lookie lou or were you like, hoping to disrupt that? Or what, what were you, what were you, what was your goal?

Bowman (00:45:24):
I mostly took pictures. I remember taking, uh, pictures. There was like a, there was like Somero Greek or Roman statue. Inside of the, it was a big, uh, it was like a centurion almost.

FBI Agent (00:45:38):
Okay. Inside the Senate chambers.

Bowman (00:45:39):
Mm. It was by it I think. It was near it. But I remember just taking pictures.

Second FBI Agent (00:45:51):
**What was your intention from the get-go, did you guys [inaudible], and then since you were inside, from that point on, the intention changed?**

Bowman (00:46:03):
**Nothing.**

Second FBI Agent (00:46:04):
**Nothing, seemed crowd mentality?**

Bowman (00:46:06):
**No. It was like we, we were, we're in here. It was like, uh, it was like, uh, we're a dog. We, we got the car. We don't know what to do. I…**

FBI Agent (00:46:18):
That's a great analogy. You know, I see that. Were you, to his question, to your point, uh, were, was there ever a moment where you're in there and you're like, oh shit, we caught the car.

Bowman (00:46:31):
… I remember…

FBI Agent (00:46:31):
…maybe I shouldn't have, maybe I shouldn't have been chasing it and maybe I need to leave?

Bowman (00:46:35):
On my way out. There were, uh, capitol policemen who, um, I remember this distinctly, or I remember that we asked them [inaudible]. I was like this. "Thank you."

FBI Agent (00:46:48):
You asked them how to get out, to leave the, to leave the capitol.

Bowman (00:46:51):
I don't know if I asked them, but they definitely told us where, which way in the hallways.

These statements were obtained from the co-defendant after an FBI Agent appeared to

threaten his dog after coming into Mr. Bowman's house.

Mr. Bowman's statements to the FBI make it clear that the co-defendants had no advance plan of entering the Capitol and simply followed along with the crowd without a specific goal in mind. The boys' entry was simply a crime of opportunity.

## C) Age at Time of Offense

Christopher Carnell was 18 at the time of the offense. His co-defendant, David Bowman, was 19.

As Chris stated to his probation officer:

I wish I had known then what I know now because I never would have entered that building. I wish I didn't follow the crowd. Every day since that day, I've regretted my actions. I was 18 years old back then. I'm now 22. On January 6, I was barely out of high school. There's certainly a difference between who I was at age 18, getting carried away with a crowd, and who I am now, at the end of college. I can honestly say that I would never have entered the Capitol if I was back then the man I am today.

My goal in life is to work as a civil engineer. I want to make the world a better place, not to be a burden. I want to design and build infrastructure that has a real-world impact, to improve the safety of our roads, bridges, and stormwater systems. I've worked very hard over the past three and a half years to learn about these things, to change my life and to become a better person, a productive person.
…
I hope that the mistake I made on January 6, the greatest mistake I've ever made, doesn't end up destroying my life.

ECF No. 106, *10.

Since January 6, Christopher Carnell engaged in significant self-reflection. He has been embarrassed and remorseful about his transgressions, as his parents have corroborated. *See* Defense Exhibits 2 and 3, *letters from Christopher's parents*.

### III. SENTENCING GUIDELINES

As then-Judge Gorsuch once stated, the purpose of sentencing is to "wisely weigh things that cannot be easily weighed." *United States v. Sabillon-Umana*, 772 F. 3d 1328, 1330 (10th Cir. 2014).

> How much punishment is enough to protect the public? To deter future wrongdoing? To reflect the gravity of the offense? And how much punishment suffices to accomplish all these things without verging on cold revenge or needless retribution? …our system depends, as perhaps it must, on the discretion of thoughtful judges.

*Id.*

The first step of this monumental task is to determine the applicable advisory Sentencing Guidelines. *Gall v. United States*, 128 S.Ct. 586, 590 (2007) ("Guidelines are the starting point and initial benchmark but are not the only consideration"). From there, a judge must "tailor every sentence to the case and defendant at hand." *Sabillon-Umana*, 772 F. 3d at 1330. A judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall,* 128 S. Ct. at 597. The judge must carefully weigh each of the 18 U.S.C. § 3553(a) factors to determine whether they support the sentence argued for by each party. *Id*. at 596-97. The final sentence ordered by the Court "must… promote the perception of fair sentencing." *Id*. at 597. An appropriate sentence is defined by Congress as one that is "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)]." *See* 18 U.S.C. § 3553.

"[T]he Guidelines are not mandatory." *Gall,* 128 S. Ct. at 602.

**A) Computing the Guidelines Sentencing Range**

Mr. Carnell agreed to a stipulated trial and was found guilty of all charges. He also accepted responsibility for his actions. The PSR correctly states the applicable Guidelines and calculates the correct range of penalties for this case. *See* ECF No 106.

Mr. Carnell's base offense level for the felony charge is 14, which is reduced by 2 points for acceptance of responsibility and by another 2 points for him being a non-violent first-time offender, bringing his total offense level down to 10. Since his criminal history category is I, the guideline imprisonment range is 6 to 12 months under the Sentencing Guidelines. However, because his penalty range is in that unique zone, Zone B of the Sentencing Table, Mr. Carnell's sentence may be served in full as a sentence of probation. *See* U.S.S.G. §5C1.1(c). This is the option that is recommended by the Probation Office for this defendant. *See* ECF No 107.

A sentence of probation is consistent with the intent of Congress. Pursuant to 28 U.S.C. § 994(j), because Mr. Carnell is a first-time offender who has not been convicted of a crime of violence or an otherwise serious offense, the appropriate sentence recommended by Congress is one "other than imprisonment."[5] Moreover, the Supreme Court stated in *Gall* that " § 3553(a)(3)

---

[5] While this was reflected in the former Guidelines, under U.S.S.G. §5C1.1 n.4 (amended on November 1, 2023), the new U.S.S.G. § 4C1.1 (which replaced §5C1.1 n.4 in November of this year) fails to note *the intent of Congress* as required by 28 U.S.C. § 994(j). Accordingly, the new combination of U.S.S.G. §§ 4C1.1 and 5C1.1 falls short of the intent of Congress announced in 28 U.S.C. § 994(j) because the combination of these sections fails to explicitly call for a first-time offender who has not been convicted of a crime of violence or an otherwise serious offense to serve a sentence "other than imprisonment" — an explicit intent of Congress.

Note on new amendment: "In 2018, the Commission added a new application note to the Commentary to §5C1.1 (Imposition of a Term of Imprisonment), stating that if a defendant is a 'nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment.' (See USSG App. C, amendment 801.) In 2023, the Commission added a new Chapter Four guideline, at §4C1.1 (Adjustment for Certain Zero-Point Offenders), providing a decrease of 2 levels from the offense level determined under Chapters Two and Three for 'zero-point' offenders who meet certain criteria. In addition, the Commission further amended the Commentary to §5C1.1 to address the alternatives to incarceration available to 'zero-point' offenders by revising the application note in §5C1.1 that addressed 'nonviolent first offenders' to focus on 'zero-point' offenders. (See USSG App. C, amendment 821.)"

Available at https://guidelines.ussc.gov/apex/r/ussc_apex/guidelinesapp/appendixc-detail?APP_AMEND_ID=821



directs the judge to consider sentences other than imprisonment." *Gall v. United States*, 128 S.Ct. 586, 602 (2007).

The defense agrees with the recommendation of the Probation Office in that a period of probation as consistent with 28 U.S.C. § 994(j). However, the Defense believes that the recommended *length* of probation is greater than necessary to achieve the aims of sentencing. The Defense believes that a period of one year of probation is more appropriate in this case.

The Defense sentence recommendation is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a), and within the limitations placed on this Court by Congress and the Eighth Amendment.

The seven factors for this court to consider under 18 U.S.C. § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant [*discussed supra*]

(2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation [*discussed infra*]

(3) the kinds of sentences available (e.g., whether probation is prohibited or a mandatory minimum term of imprisonment is required by statute)

(4) the sentencing range established through the application of the sentencing guidelines and the types of sentences available under the guidelines

(5) any relevant "policy statements" promulgated by the Sentencing Commission

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar *conduct* [*discussed supra*]

(7) the need to provide restitution to any victims of the offense [*discussed supra*]

**B) Sentencing Limitations**

While the sentencing court has discretion over imposing an appropriate penalty, Congress has placed limits.

This court's ability to impose probation or imprisonment is limited by 18 U.S.C. §§ 3551 and 3561(a)(3), which deem the two independent penalties of probation and imprisonment as *alternatives* to one another. *See United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023); *United States v. Martin*, 363 F.3d 25, 35 (1st Cir. 2004) ("both § 3551(b) and § 3561 require a district court to choose between probation and imprisonment when imposing its original sentence"). This court only has the power to impose (1) a term of probation, (2) a fine as authorized, **or** (3) a term of imprisonment. "Probation and imprisonment are alternative sentences that cannot generally be combined." *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). An exception is carved out in 18 U.S.C. § 3551 for a fine — a fine is explicitly permitted to be tacked to another penalty. No other tacking or conjunctive exceptions are noted in the Code.

Supervised release is the Code's exclusive form of post-confinement monitoring and may only be ordered if a defendant is sentenced to a term of imprisonment. *See* 18 U.S.C. § 3583; *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). Supervised release conditions are subject to the mandatory and discretionary conditions outlined by Congress in 18 U.S.C. § 3583.

Probationary conditions that this Court may order are limited to the mandatory and discretionary conditions outlined in 18 U.S.C. § 3563. Imposition of a discretionary condition must be "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the

extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)." *See* 18 U.S.C. § 3563(b).

Restitution can only be ordered for losses caused by the conduct underlying the offense of conviction. *See United States v. Jabr*, 4 F.4th 97, 105 (D.C. Cir. 2021) (18 U.S.C. § 3663 "compensate[s] victims only for losses caused by the conduct underlying the offense of conviction."); *see also In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012) (defendant not required "to pay restitution for harm he did not cause"). Federal courts do not have inherent authority to order restitution and may do so "solely pursuant to statute." *United States v. Anderson*, 545 F.3d 1072, 1077 (D.C. Cir. 2008); *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012).

Additional limitations on the imposition of a penalty include the underlying justification for the penalty. For example, a term of imprisonment cannot be imposed or lengthened for rehabilitative purposes, see 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k); and, a sentence upon revocation of supervised release cannot be imposed for retributive purposes, see 18 U.S.C. § 3583(e). *See also Tapia v. United States*, 131 S.Ct. 2382 (2011). An appropriate sentence is defined as "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)]." *See* 18 U.S.C. § 3553.

Moreover, any sentence imposed by this Court is limited by the Eighth Amendment's restrictions on excessive fines and cruel and unusual punishment.

## C) Sentencing a Youthful Offender

Mr. Carnell, at age 18, was less than a year out from being juvenile offender under 18 U.S.C. § 5031. Youthful age, nonetheless, is considered by the Guidelines as well. "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1. The Supreme Court specifically discussed the reasonableness of departing from the Guidelines when the defendant, at the time of the offense, was 21 years old. *See Gall v. United States*, 128 S. Ct. 586 (2007) (finding that "the § 3553(a) factors, on the whole, justified the sentence" of probation even though the Guidelines called for incarceration).

In *Gall*, the defendant was part of a conspiracy for the distribution of 10,000 pills of ecstasy. He was 21 years old at the time. The District Judge reasoned his participation was part of his youthful age, addiction, and "immaturity." *See Gall*, 128 S. Ct. at 601. The District Judge opined that —

> Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five.... [T]he recent [National Institutes of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Id*. The Supreme Court affirmed this specific reasoning. "[I]t was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future." *Id*. See also *Johnson v. Texas*, 509 U.S. 350, 367 (1993)

(holding that a jury was free to consider a 19-year-old defendant's youth when determining whether there was a probability that he would continue to commit violent acts in the future); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage").

Scientific studies support the observations that sentencing judges make in court about youthful offenders.[6] The prefrontal cortex, which is located at the front of the frontal lobe and is the last part of the brain to fully develop, is utilized in impulse control, emotional reactions, executive function and decision making.[7] These are the executive functions that a human uses to make decisions to engage in criminal activity. But maturation of the frontal lobe is not completed until a human reaches his mid-20s. *Id*. It is a scientifically-agreed-upon fact that at Chris Carnell's age at the time of the offense, **at age 18, the prefrontal cortex is not complete**.[8] Therefore, Christopher Carnell, at the time of the offense, lacked complete brain maturation.

---

[6] *Youthful Offenders in the Federal System*, UNITED STATES SENTENCING COMMISSION (May 2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf.

[7] Cassandra B. Romine & Cecil R. Reynolds, *A Model of the Development of Frontal Lobe Functioning: Findings From a Meta Analysis*, 12(4) APPLIED NEUROPSYCHOLOGY 190–201 (2005); *Youthful Offenders in the Federal System*, UNITED STATES SENTENCING COMMISSION (May 2017).

[8] Sara B. Johnson, Robert W. Blum, & Jay N. Giedd, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45(3) JOURNAL OF ADOLESCENT HEALTH, 216–21 (2009); *Youthful Offenders in the Federal System*, UNITED STATES SENTENCING COMMISSION (May 2017).

# IV. Incapacitation, Rehabilitation, Retribution, Restitution, and Deterrence

The main aims of sentencing have been accomplished pre-sentencing in this case.

(A)      **Specific deterrence** has been achieved through Chris Carnell maturation (he is 22 now and a college graduate, but was 18 and just out of high school at the time of the offense), the humiliation of the arrest for him and his family — *see* Defense Exhibits 2 and 3, letters from Christopher's parents — pretrial supervision with conditions, the process of being publicly shamed in the media for his conduct, and finding of guilt on misdemeanor and felony offenses from January 6 that will permanently stain Mr. Carnell's clean record. He walks away from college graduation with both a degree and a criminal record.



The experience of being arrested, going through court appearances in two federal jurisdictions, conferences with counsel, public shaming in the media and on social media, constant contact with a probation officer — and federal criminal prosecution in and of itself — the convictions, as well as the personal tribulations that went along with the stress and the shame, have created more than what Christopher Carnell ever needed as specific deterrence. This defendant's agreement to a stipulated trial and his statement acknowledging his misdeeds and accepting responsibility, solidify the defendant's permanent understanding of the bounds of the law. Mr. Carnell has learned a blistering lesson about a fine line that he will not cross again.

Mr Carnell's statement to probation shows acceptance of responsibility as well as remorse, understanding, and maturity.

> I wish I had known then what I know now because I never would have entered that building. I wish I didn't follow the crowd. Every day since that day, I've regretted my actions.

> I was 18 years old back then. I'm now 22. On January 6, I was barely out of high school. There's certainly a difference between who I was at age 18, getting carried away with a crowd, and who I am now, at the end of college. I can honestly say that I would never have entered the Capitol if I was back then the man I am today.

> My goal in life is to work as a civil engineer. I want to make the world a better place, not to be a burden. I want to design and build infrastructure that has a real-world impact, to improve the safety of our roads, bridges, and stormwater systems. I've worked very hard over the past three and a half years to learn about these things, to change my life and to become a better person, a productive person.

> I hope that the mistake I made on January 6, the greatest mistake I've ever made, doesn't end up destroying my life.

*See* ECF No. 106 at*10.

Further specific deterrence is plainly unnecessary for this defendant.



(B)     ***Rehabilitation*** has been achieved through Christopher Carnell's maturing age, understanding and regret, and focus on college and moving forward with his life. He has obtained a Bachelor of Science Degree and is seeking employment. This is not a young man seeking opportunities to commit further offenses.

Most importantly — Mr. Carnell no longer communicates with the group of friends who led him down this path, which, for a young man his age, is in all reality the most effective mode of conduct correction.

(C)     ***Incapacitation*** is unwarranted for this defendant.

As a first-time offender, this defendant has the lowest likelihood to re-offend, according to the U.S. Sentencing Commission's research on the recidivism of federal offenders.[9] A first-time offender who has not been convicted of a crime of violence or an otherwise serious offense should receive a sentence "other than imprisonment," according to Congress. *See* 28 U.S.C. 994(j) ("the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense"); *see also former* U.S.S.G. §5C1.1 (comment n.4). Incapacitation in the form of imprisonment simply is incongruent with this case and this particular defendant.

In line with the aims of Congress and the Sentencing Guidelines, the facts of Mr. Carnell's case, his age and character, and his acceptance of responsibility and his new college degree, as well as the Guidelines computation, have resulted in the United States Probation

---

[9] *Recidivism of Federal Offenders Released in 2010*, U.S. SENTENCING COMMISSION (Sep. 30, 2021), https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.

Office recommending that Mr. Carnell not be sentenced to incarceration. Instead, the Probation Office recommended probation for Mr. Carnell.

Moreover, one can reason that over a year of pretrial supervision has already served an *incapacitative* effect on Mr. Carnell, a first-time offender.

Another point of consideration is that incarceration would result in Mr. Carnell, a recent college graduate, from pursuing employment in construction management, which requires in-person and on-scene presence.

Incarceration, therefore, is excessive, unwarranted, and inappropriate in this case.

The less-incapacitative option of a sentence of probation is most fitting. Moreover, if this court felt that probation require conditions, 18 U.S.C. § 3563(b) allows probation to be customized to the special needs of a defendant, giving this court the toolkit with which to balance the needs of the defendant with effective incapacitation. The court may require home detention under 18 U.S.C. § 3563(b)(19); the performance of community service under § 3563(b)(12); and/or any other condition as the court deems just under § 3563(b)(22).

Accordingly, probation for a period of one year would be a fair and appropriate penalty in this case.


(D)    ***Restitution*** is not a concern in this case. Mr. Carnell did not injure anyone and did not break any property. He was not the direct cause to any damage and cannot be held liable for restitution. *See* page 15, *supra*.

(E)     In observing the arrests of January 6 defendants through the meticulous reporting of the mainstream media and seeing relentless prosecution of January 6 participants, the public has been provided with more than sufficient **general deterrence**. Hundreds of thousands of news articles have been published about the arrests and prosecutions of January 6 defendants and numerous congressional hearings related to January 6 have taken place. Donald Trump himself has been indicted and is being prosecuted for his role in the events of January 6. On top of that, the DOJ has created unique public-shaming web pages for every January 6 defendant, a digital version of tar and feathering.[10] The public has been put on clear notice that transgressions against the Capitol or the operation of the Federal Government will not be tolerated.

Conservatives and Trump supporters have been uniquely deterred as political groups— having grown genuinely frightened by engaging in any protest against the Federal Government, a much deeper (and more troubling) general deterrence than is called for by our standard understanding of penal law. For example, when a protest was organized in support of improving detention conditions for January 6 arrestees in September of 2021, only about 100 people arrived to protest, with police and media vastly outnumbering the protesters.[11] When Donald Trump was called into this courthouse for his initial appearance in August of 2023, protesters were difficult to find.[12] "[O]nly around a dozen supporters of the former president were outside the courthouse," reported Politico.[13]

---

[10] Available at: https://www.justice.gov/usao-dc/capitol-breach-cases

[11] *Police outnumber protesters at right-wing Capitol rally*, BBC NEWS (Sep. 19, 2021), https://www.bbc.com/news/world-us-canada-58612965.

[12] Kyle Cheney (@kyledcheney), Twitter (Aug 3, 2023, 8:05 AM), https://twitter.com/kyledcheney/status/1687072114359103488.

[13] Andrew Zhang, *Subdued crowd gathers outside Washington courthouse where Trump was arraigned*, POLITICO (Aug. 3, 2023), https://www.politico.com/news/2023/08/03/trump-indictment-courthouse-arraignment-00109643.

Other political groups have also been deterred from staging protests by the January 6 arrests. The Virginia militia chapter leader of the "Boogaloo" movement (A.K.A. "Virginia Knights" and "Last Sons of Liberty") stated in a recorded video interview on August 18, 2023: "I haven't done any protests since January 6, 2021."[14]

Accordingly, the DOJ has already achieved general deterrence through its unprecedented, unyielding prosecution of all defendants, no matter the magnitude of involvement, top to bottom — from the former President of the United States himself to individuals who briefly trespassed.

(F)   ***Retribution*** in this case has also been accomplished before the imposition of sentence — by the general public contributing significantly to the arrest of the individuals photographed inside the Capitol.[15]

A substantial portion of the January 6 defendants have been identified and brought to FBI attention through "crowdsourcing" with the public's assistance.[16] Civilian groups such as *Sedition Hunters* have formed to identify and report those who were involved.[17] Friends, coworkers, and even family members have reported a substantial portion of January 6

[14] Ford Fischer (@FordFischer), Twitter (Aug 18, 2023, 11:32 PM), https://twitter.com/FordFischer/status/1692741297717535039.

[15] Phil Rogers, '*Sedition Hunters' Seek to Identify Participants in Jan. 6 Capitol Attack,* NBC CHICAGO (11/24/2021), https://www.nbcchicago.com/investigations/sedition-hunters-seek-to-identify-participants-in-jan-6-capitol-attack/2693284; Sukrit Venkatagiri, Tianjiao Yu, Vikram Mohanty, and Kurt Luther, *Sedition Hunters: A Quantitative Study of the Crowdsourced Investigation into the 2021 U.S. Capitol Attack,* WWW '23: PROCEEDINGS OF THE ACM WEB CONFERENCE 2023 (April 2023), https://dl.acm.org/doi/pdf/10.1145/3543507.3583514.

[16] *Researchers study the crowdsourced investigation of Jan. 6, 2021,* VIRGINIA TECH (May 3, 2023), https://liberalarts.vt.edu/news/articles/2023/05/liberalarts-crowdsourced-investigation-study.html.

[17] Will Carless, *After Jan. 6 riot, hundreds of identifiable people remain free. FBI arrests could take years*, USA TODAY (Mar. 2, 2023), https://www.usatoday.com/story/news/nation/2023/03/02/sedition-hunters-hundreds-jan-6-rioters-pending-fbi-arrests/11283885002.



participants.[18] The FBI, in turn, has provided a sense of retributive satisfaction to those who assisted law enforcement by arresting the identified individuals, no matter the extent of their role on January 6. Retribution, accordingly, had been accomplished through the public's partnership with the FBI and the DOJ— and the arrests and prosecutions that followed.

_____

Therefore, each of the main aims of sentencing have been met in this case pre-sentencing.

_____

[18] Hannah Knowles and Paulina Villegas, *Pushed to the edge by the Capitol riot, people are reporting their family and friends to the FBI*, THE WASHINGTON POST (Jan. 16, 2021), https://www.washingtonpost.com/nation/2021/01/16/capitol-riot-family-fbi; Cassidy McDonald, *Dozens of Capitol rioters were turned in by childhood friends, family members, colleagues and ex-lovers who watched them storm the building*, CBS NEWS (Mar. 9, 2021), https://www.cbsnews.com/news/capitol-riot-arrests-friends-turned-in.

## V. AVOIDING SENTENCING DISPARITIES

According to the Government, January 6 cases are incomparable to preceding criminal cases and thus exempt from fair comparison with any cases that are not January 6 cases. As such, the Government seeks a disproportionately high sentence for all January 6 participants, including ones convicted of nonviolent offenses. The problem with the Government's proposition is that the Government is responsible for creating the uniqueness of the January 6 prosecutions.

### A) Only One Person Federally Charged for Protest Misconduct in the Capitol Prior to January 6, 2021

Prior to the January 6 prosecutions, only one protester was charged federally for protest misconduct in the Capitol — *only one* — Tighe Barry. *See United States v. Tighe Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018). Mr. Barry was charged under 40 U.S.C. §§ 5104(e)(2)(D) and (G), which are class B misdemeanor petty offenses for disorderly conduct and parading in a Capitol building. Yet when he was initially arrested and charged under the local D.C. Code, Mr. Barry was charged with the more serious offenses of Resisting Arrest and Disorderly Conduct. *See* D.C. Superior Court Docket No. 2018 CMD 013221. Those charges were inexplicably dropped, however, and the conduct was not prosecuted at all.



On September 6, 2018, in the public viewing area for the Senate Judiciary Committee hearing for Brett Kavanaugh, Mr. Barry pulled out a large sign with political writing, stood on top of a chair, and shouted something political. As Capitol Police approached him, he leaped forward and pushed a chair into a person who happened to have been sitting in front of him. *Barry,* 1:18-mj-00111-RMM, ECF No. 34 (D.D.C. October 11, 2019). Mr. Barry "had to be carried by his arms and legs out of the committee hearing room while he continued his demonstration." *Id*. At the time, Mr. Barry had <u>14 prior arrests</u> on his record for similarly disruptive behavior. *Id*.

Tighe Barry was the very first person — ever— who was federally charged for protest or disruptive behavior at the Capitol. *Barry,* 1:18-mj-00111-RMM, ECF No. 10 ("Notably, no other person charged with protest and/or disruptive-type behavior at the U.S. Capitol Grounds has been previously charged in federal court for the District of Columbia."). And, as mentioned initially, his federal charges did not encompass the full scope of his conduct, such as assault and resisting arrest.

Mr. Barry was one of 1,188 Kavanaugh protesters arrested in 2018 for misconduct during the Senate confirmation hearings for Justice Brett Kavanaugh[19] — constitutionally-mandated proceedings, of note. Other than Mr. Barry, 1,179 Kavanaugh protesters had their criminal charges dismissed without even needing to go to court. *See Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018). This is because the Kavanaugh protesters were charged

---

[19] Amanda Becker, *Hundreds arrested in multi-day protests of U.S. Supreme Court nominee*, REUTERS (Sept. 7, 2018), https://www.reuters.com/article/usa-court-protests/hundreds-arrested-in-multi-day-protests-of-u-s-supreme-court-nominee-idINKCN1LN2K6; Cheyenne Haslett, *Kavanaugh protests escalate, over 120 arrested on Capitol Hill*, ABC NEWS (Sep. 24, 2018), https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hill/story?id=58048599; *Natalie Delgadillo, Update: Capitol Police Have Arrested More Than 200 Protesters At Kavanaugh Hearings*, DCist (Sept. 4, 2021), https://dcist.com/story/18/09/04/kavanaugh-hearing-arrests.

under the local D.C. code, and their charges were dismissed under D.C.'s "post and forfeit

disposition." For comparison, as of May of this year, 1,424 people have been arrested for January

6 offenses.[20] They were all charged federally; none of the January 6 charges have been dismissed

pursuant to a leniency disposition.

Sandra Steingraber was one of the Kavanaugh protesters arrested in 2018 in the Gallery

for disrupting the Senate proceedings. She was arrested by Capitol Police but charged under the

local DC code for the offense of "Crowding, Obstructing, or Incommoding" under the Code of

the District of Columbia § 22–1307, which penalizes the act of engaging "in a demonstration in

an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a

demonstration after being instructed by a law enforcement officer to cease engaging in a



---

[20] Press release, 40 *Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (May 6, 2024), https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol.

demonstration."[21] The DOJ chose not to get involved and not to charge the federal variation of this offense. As such, the case was dismissed as soon as she paid a $50 fine.

Ms. Steingarber was able to obtain this favorable outcome without counsel under DC's "post-and-forfeiture" procedure, which is a streamlined dismissal for a person charged with certain misdemeanor offenses that allows a defendant to post and simultaneously forfeit a particular sum of money, thereby obtaining a full and final resolution of the criminal charge. Moreover, a "post and forfeit" is not an admission or adjudication of guilt.

Ms. Steingraber later bragged about her disruption of Senate proceedings on Twitter.[22] Unlike its interest in the public statements of, and social media usage of, the January 6th defendants, the DOJ was uninterested in either the social media use or the post-arrest statements of the Kavanaugh protesters.

Importantly, this was not Ms. Steingraber's first charge or arrest— she had at least one prior arrest in DC at the time, according to DC court records— and for the same conduct. Ms. Steingraber was actually one of 503 people who were repeat offenders and who received a "post and forfeit" disposition. *See United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018).

Christopher Carnell's entry into the Capitol was at a more consequential moment for Congress and this Country than when Mr. Barry and Ms. Steingraber performed their

---

[21] Compare with the code section the FBI charged every January 6 participant who entered the Capitol, 40 U.S.C. §5104(e)(2)(G), which makes it unlawful to willfully and knowingly "parade, demonstrate, or picket in any of the Capitol Buildings." And, a mirror version of this law appears under D.C. Code § 10–503.16(b)(7), which also makes it unlawful to willfully and knowingly "parade, demonstrate, or picket within any of the Capitol Buildings."

[22] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Sandra Steingraber (@ssteingraber1), Twitter (Oct. 7, 2018, 12:55 PM), https://twitter.com/ssteingraber1/status/1048980210211872769.



transgressions; the defense is not trying to diminish that. Nonetheless, it is important to see his conduct contextually with other protesters who had interrupted proceedings in the past.

Unlike Ms. Steingraber, Mr. Carnell did not plan to enter the Senate Chamber and did not publicly post plans to commit a crime prior to walking into the Capitol.[23] Moreover, Mr. Carnell had a clean record walking in, unlike Ms. Steingraber.

And, Mr. Carnell is not like Mr. Barry. He didn't personally interrupt an active session of Congress (the Senate were recessed when Mr. Carnell walked into the Chamber), he didn't hurt anyone, and he didn't resist arrest. Mr. Carnell had a clean record and no preexisting intention to walk into the Capitol. Mr. Carnell didn't need to be carried out of the Capitol by his arms and legs. Yet, Mr. Carnell was prosecuted more aggressively than the lone standout from the Kavanaugh protesters who assaulted a person in the Senate and had a long history of prior arrests.

## B) DOJ Approach to 2020 Political Riot Cases

The BLM political riots of 2020, which preceded the January 6, 2021 Capitol incident by a few months, show a glaring disparity in DOJ treatment of similarly situated defendants.[24] Although the DOJ had jurisdiction to charge — around 300 individuals were charged by the DOJ

---

[23] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Sandra Steingraber (@ssteingraber1), Twitter (Oct. 7, 2018, 12:55 PM), https://twitter.com/ssteingraber1/status/1048980210211872769. Two years later, she tweeted: "Woke up thinking about the day Brett Kavanaugh was confirmed by the Senate and 13 women stood up in the gallery, 1 by 1, to disrupt the vote and were arrested and media reported they were screaming but actually they were making statements about sexual assault. I was one of them." Sandra Steingraber (@ssteingraber1), Twitter (Nov. 3, 2020, 8:31 AM), https://twitter.com/ssteingraber1/status/1323618700457627650. According to D.C. Superior Court online records, Ms. Steingraber has been arrested two additional times after the Kavanaugh incident, for the same type of charge, and it has been identically disposed of under the post-and-forfeit disposition.

[24] Available video footage of the 2020 riots has been collected and stored at https://riotarchive.com.



(this is a total number from 29 states and Washington, D.C.) — only the violent or serious offenders were pursued. Charges included attempted murder, arson, burglary, assaulting law enforcement, damaging federal property, malicious destruction of property using fire or explosives, felon in possession of a firearm and ammunition, possession of a destructive device, and serious cases of civil disorder.[25] Unlike its relentless dedication to convict January 6 participants, the DOJ decided to dismiss many of the violent charges against BLM protesters, including charges of assaults on law enforcement.[26]

_____

[25] Press Release, *Over 300 People Facing Federal Charges For Crimes Committed During Nationwide Demonstrations*, DOJ (Sep. 24, 2020), https://www.justice.gov/opa/pr/over-300-people-facing-federal-charges-crimes-committed-during-nationwide-demonstrations.

[26] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.

### i. <u>Portland, Oregon</u>



In Portland, Oregon, the federal courthouse — along with its police officers, local police department, and surrounding neighborhood— was continuously attacked by left-wing protesters for a sustained period lasting over 100 days.[27] While the federal crimes were deliberate and premeditated, only about 103 individuals were arrested throughout the four-month ordeal, most for arson and serious assaults on police officers.[28] The DOJ put out a press release on the relentless riots, saying: "violence instigated and carried out by Antifa and other similar groups in connection with the rioting is domestic terrorism and will be treated accordingly."[29] Yet, **the**

---

[27] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.

[28] Unlike their public searchable list of January 6 prosecutions, the DOJ does not publicize its list of Portland cases. A collection of federal cases can be found by private individuals tracking and archiving publicly-revealed individual case data on AntifaWatch.net. See also *Seventy-four face federal charges from Portland protests*, AP NEWS (Aug. 27, 2020), https://apnews.com/article/1c1901dd9c286794791dacc39b0a6727.

[29] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, DOJ (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.



**overwhelming majority of the riot defendants had their federal charges** *dismissed*.[30] *See also* Defense Exhibit 4, *Examples of 2020 Riot Case Dismissals in Portland*. These dismissal decisions were made despite the aforementioned DOJ press release calling the relentless riots "domestic terrorism."

In what world would it be considered "*justice*" for those who committed numerous felonious assaults, with injuries, on police officers to receive more lenient treatment than a nonviolent 18 year old who trespassed foolishly? Yet that is exactly the word that the DOJ used when dismissing the case of Joshua Warner (AKA "Eva"). Warner was arrested *three separate times* during the 2020 Portland riots for assaults on police, resisting arrest, criminal mischief, another assault on police, etc.[31] Warner was charged under federal law with civil disorder for "targeting the eyes of multiple law enforcement officers with a high-powered laser during an August 8, 2020 riot in



---

[30] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL  (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.; Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, FOX NEWS (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

[31] Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, FOX NEWS (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.



North Portland," a DOJ press release read.[32] Yet, the DOJ did not pursue federal assault charges and dismissed the civil disorder charge in exchange for just 30 hours of community service, saying it was "in the best interests of justice." *United States v. Warner*, Case 3:20-cr-00442-HZ, ECF No. 26 (D. Or. Dec. 21, 2021).[33] Mr. Carnell did not receive a plea offer for dismissal in exchange for community service; the Government wouldn't even dismiss the controversial single felony count against him for a guilty plea deal to a misdemeanor offense.

This is the same Department of *Justice* that decided that Christopher Carnell's January 6 participation rendered him ineligible for deferred prosecution and ineligible for a misdemeanor plea deal — even though his conduct on January 6 fell well below the actions of Defendant Warner in Portland and even though Mr. Carnell was only 18 years old at the time of the offense while Defendant Warner was a grown adult.

Even though his conduct was nowhere near the level of the Portland defendant, Mr. Carnell will live out the rest of his life as a convicted criminal, while the person who assaulted and seriously endangered the eyesight of multiple police officers in Portland (then came back two additional times after being arrested to commit more crimes) walked away above reproach.

Adding insult to injury, the small handful of individuals who were actually convicted of their federal crimes in Portland received *significant* leniency from the DOJ at sentencing.

For example, after securing a conviction for Kevin Benjamin Weier for the felonious depredation of Government property for the act of **setting fire to the Portland federal**

---

[32] *Press Release, Beaverton Woman Charged with Civil Disorder After Targeting Police Officers with High-Powered Laser,* UNITED STATES ATTORNEY'S OFFICE DISTRICT OF OREGON (Sep. 3, 2020), https://www.justice.gov/usao-or/pr/beaverton-woman-charged-civil-disorder-after-targeting-police-officers-high-powered-laser.

[33] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.155702/gov.uscourts.ord.155702.26.0.pdf.

*courthouse*— a felony offense punishable by up to 10 years in prison, a $250,000 fine, and three

years supervised release— the Government filed a

five-page, bare-bones sentencing memorandum that

asked to sentence the defendant to ***a one-year term***

***of probation***. *See United States v. Weier*, Case No.

3:20-cr-00263-IM, ECF No. 39, *5 (D. Or. Nov. 10,

2021).[34] Of note— this is the sentence that Mr.

Carnell seeks for his case, a case that involved no

destruction of property.

> Case 3:20-cr-00263-IM    Document 39    Filed 11/10/21    Page 5 of 5
>
> **CONCLUSION**
>
> Based on the foregoing, the parties jointly recommend that this the Court impose a one-year term of probation, subject to the standard conditions, plus the special conditions recommended by the Probation Office, and a $100 fee assessment.
>
> Dated: November 10, 2021.
>
> Respectfully submitted,
>
> SCOTT ERIK ASPHAUG
> Acting United States Attorney
>
> /s/ Ashley R. Cadotte
> ASHLEY R. CADOTTE, OSB #122926
> Assistant United States Attorney

For perspective, compare the DOJ's request for Mr. Weier to the sentence requested for

January 6 defendant Michael Stepakoff, a rabbi who was convicted of a petty misdemeanor for

walking into the Capitol on January 6, shaking hands with a police officer, thanking him for his

service, and walking out after only 5 minutes inside the building — "14 days in custody followed

by three years' probation, 60 hours of community service and $500 in restitution." *See United*

*States v. Stepakoff*, 1:21-cr-00096-RC, ECF No. 36, *27 (D.D.C. January 11, 2022).[35] In Mr.

Carnell's case, the Government has informed the defense that they will be seeking a sentence of

incarceration despite the fact that, unlike Mr. Weier's acts of arson, Mr. Carnell's conduct

resulted in no injuries and no damage to any property, and did not endanger anyone's life.

Furthermore, Mr. Weier's probation recommendation for a felony arson offense was

agreed to via a plea agreement that <u>did not</u> reserve the right for the DOJ to seek a terrorism

---

[34] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.153765/gov.uscourts.ord.153765.39.0.pdf.

[35] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227275/gov.uscourts.dcd.227275.36.0.pdf.

enhancement even though the described activity was deemed terrorism by the Attorney General. *See* Footnote 41; *United States v. Weier*, Case No. 3:20-cr-00263-IM, ECF No. 35 (D. Or. Aug. 19, 2021). Yet, all plea offers made to January 6 defendants, even *Class 1 misdemeanor* plea agreements for nonviolent January 6 trespassers, reserved the option for the DOJ to attempt to seek an upward departure for terrorism under U.S.S.G. § 3A1.4, n. 4. *See, e.g.*, *United States v. Kuehne*, Case No. 1:21-cr-160-TJK, ECF No. 197, *4 (D.D.C. Sep. 7, 2023)[36]; *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 75, *4 (D.D.C. Oct. 13, 2021).[37]

---

[36] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.228126/gov.uscourts.dcd.228126.197.0.pdf.

[37] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.75.0_1.pdf.

### ii. Seattle, Washington



In Seattle, BLM protests led to similar arson and violence as in Portland — with similar commiseration from the DOJ.

While the destruction in Seattle during the summer riots was extensive, only two defendants were federally charged for their conduct.[38] (Additional riots in Seattle took place in later months and are discussed separately, *infra*).

The first Government sentencing memorandum filed in the Seattle cases was for a woman charged with felony arson of five police vehicles. The Government memo revealed how the DOJ viewed the progressive BLM protest in Seattle: "an important cause" that "should have been an inspiring event" with an "important message." *See United States v. Channon*, Case No. 2:20-cr-00129-JCC, ECF No. 76 (W.D. Wash. Feb 8, 2022).[39]

The second sentencing memorandum that the Government filed for the Seattle cases was for a man accused of bringing a firearm to the BLM protest with the intent to kill police officers.

---

[38] Amy Radil, *These are the people who face criminal charges in Seattle after the protests*, KUOW (Jul. 9, 2020), https://www.kuow.org/stories/who-faces-criminal-charges-related-to-seattle-area-protests-here-s-a-roundup.

[39] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.wawd.288533/gov.uscourts.wawd.288533.76.0.pdf.

This man was arrested after throwing a 16-ounce can of beer through the window of a police cruiser and striking an officer in the face. In its memo, the Government described the BLM riot that resulted in millions of dollars in property damage in Seattle as "a peaceful but volatile protest." *See United States v. Parker*, Case No. 2:20-cr-00084-RSM, ECF No. 116 (W.D. Wash. Jun. 2, 2023).[40] (It's almost as if the DOJ chose such language to taunt conservatives, who were outraged at CNN for referring to the arsonous BLM riots in Kenosha, Wisconsin as "firey but mostly peaceful."[41])

 

By comparison, the rally on January 6 has only been described by the DOJ in sentencing memoranda as "a violent attack" and "a large and violent riot." *See, e.g.*, *United States v. Cudd*,

---

[40] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.wawd.287719/gov.uscourts.wawd.287719.116.0.pdf.

*See also* Katherine Anne Long and Paul Roberts, *Downtown businesses assess damage, weigh reopening after nights of riots, looting and chaos,* THE SEATTLE TIMES (May 31, 2020), https://www.seattletimes.com/business/local-business/downtown-businesses-assess-damage-weigh-reopening-after-nights-of-looting-and-chaos; Claire Sprang, *Seattle To Pay $3.6 Million in Damages to Businesses Over 2020 BLM Riots*, THE WASHINGTON FREE BEACON (Feb. 22, 2023), https://freebeacon.com/democrats/seattle-to-pay-3-6-million-in-damages-to-businesses-over-2020-blm-riots.

[41] *See* Joe Concha, *CNN ridiculed for 'Fiery But Mostly Peaceful' caption with video of burning building in Kenosha*, THE HILL (Aug. 27, 2020), https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.



Case No. 1:21-cr-68-TNM, ECF No. 90, *1-2 (D.D.C. March 16, 2022).[42] The Government has never, in any pleading known to undersigned counsel, made any sympathetic statements in commiseration with the underlying non-criminal protest on January 6 outside of the Capitol— a protest that could technically also be described as an "*important cause"* that "*should have been an inspiring event*." The hundreds of thousands of January 6 protesters who came to DC to protest election integrity on January 6, or to support their political candidate, who they earnestly believed had won the 2020 election, protesters who remained outside the Capitol and broke no laws — were not given any credit by the Government in the way that credit was given by the DOJ to non-criminal protesters in Seattle.[43] January 6 has never been described by any DOJ prosecutor as "*a peaceful but volatile protest,*" even though, under the Government's own logic, it certainly could have received such adoration.

---

[42] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.90.0.pdf.

[43] See, e.g., Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (Jan. 11, 2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("There were hundreds of thousands of people all standing together peacefully in one spot for more than five hours. A small percentage of this group entered the capitol and perpetrated mayhem while hundreds of thousands were peacefully milling around outside. Video of the event shows other attendees remonstrating with some who broke windows or stood on statues, telling them to stop.").

### iii. Minneapolis, Minnesota

Perhaps the most startling disparity of all can be seen in a memorandum filed by the Government in the District of Minnesota, where hundreds of BLM rioters engulfed Minneapolis in flames— burning homes, businesses, and even people.

On May 28, 2020, in the middle of a BLM riot, a convicted felon, who was on probation at the time, set fire to a pawn shop, saying "Fuck this place. We're gonna burn this bitch down." *United States v. Lee*, Case No. 0:20-cr-00168, ECF No. 67, *2 (D. Minn. Nov. 4, 2021).[44]  A 30-year-old man was burned to death in that fire. *Id*. at *3.

In its sentencing memorandum, the **DOJ brazenly excused the homicide**— "[the defendant] appears to have believed that he was, in Dr. King's eloquent words, **engaging in 'the language of the unheard**.'" *Id.* *9. The Government's memo does not resolve the glaring fact that the defendant's words at the time of the offense — "*fuck this place, we're gonna burn this bitch down*" — are entirely inconsistent with his post-arrest explanation related to political expression. Instead, citing Dr. Martin Luther King, Jr., **the DOJ requested *half* of the guidelines sentence for the homicide**. *Id*. *7, 12. As a reminder, this homicide was committed while the defendant was on probation for having committed another felony.

---

[44] Also available at
https://storage.courtlistener.com/recap/gov.uscourts.mnd.189358/gov.uscourts.mnd.189358.67.0_2.pdf.



### iv. Washington, D.C.

In May 2020, BLM protesters set fires around the White House, caused the President to retreat to a bunker, and clashed with federal law enforcement for days on end.[45] Depicted on the video released by the Department of the Interior, protesters were pushing police shields, assaulting federal officers, and disobeying orders.[46] CNN televised protesters tugging a protective barrier away from federal officers.[47] None of these individuals were investigated or charged for their conduct. But January 6 defendants who committed the same acts were investigated, arrested, and charged.[48]

On May 31, 2020, then-Attorney General William Barr announced that "*violent radical agitators*" from the BLM protests in D.C. would be investigated and charged.[49] Indeed, the DOJ apprehended and charged individuals for acts of bank robbery, bank burglary, arson at the Supreme Court, Molotov







---

[45] *Secret Service Statement on Pennsylvania Avenue Demonstrations*, UNITED STATES SECRET SERVICE, (May 31 2020), https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0; Shawn McCreesh, *Protests Near White House Spiral Out of Control Again*, THE NEW YORK TIMES (May 31 2020), https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.

[46] Department of the Interior Press Secretary (@DOIPressSec45), Twitter (Jun 24, 2020, 1:53 PM), https://twitter.com/DOIPressSec45/status/1275849473701433345.

[47] Andy Ngô (@MrAndyNgo), Twitter (May 30, 2020, 1:30 AM), https://twitter.com/MrAndyNgo/status/1266602847182786567.

[48] See, e.g., *United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 48 (D.D.C. May 19, 2023).

[49] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, U.S. DEPARTMENT OF JUSTICE (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.

cocktail attacks on police, and attacks on the Lincoln Memorial.[50] The January 6 investigation, on the other hand, was not limited to "*violent radical agitators.*" Instead, on January 7, 2021, Christopher Wray announced the investment of the full resources of the FBI into an indiscriminate search of "*those involved*" in January 6 misconduct, irrespective of nonviolence or the severity of an individual's involvement.[51] The result is that two-thirds of the individuals arrested for January 6 participation were charged with only nonviolent conduct— including Mr. Carnell.[52]





The overt disparity between the Government's choice to only pursue *violent agitators* from left-wing protests in Washington DC, and yet *all individuals* from the January 6 protest, yields an unavoidable conclusion: had a January 6 participant committed certain acts in the

---

[50] *See United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 59, *9 (D.D.C. Jun. 9, 2023).

[51] FBI Press Release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building* (Jan. 7, 2021), FBI, https://www.fbi.gov/news/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

[52] Press release, *40 Months Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (May 6, 2024), https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol.

middle of a BLM protest he would have gotten off scot-free, but because that individual

committed such acts in the middle of a Trump protest he was charged. That political discrepancy

is very troubling.


## C) Disparate Treatment of January 6 Participants

In 2021, Mr. Carnell's defense counsel made numerous requests for dismissal

dispositions for her January 6 clients in hopes of receiving an outcome comparable to that of the

Kavanaugh arrestees or the Portland 2020 riot cases. *See United States v. Judd*, 1:21-cr-40, ECF

No. 203 (D.D.C. December 28, 2021) (detailing dismissal dispositions for left-wing protest

cases, even *felony* charges, in Portland, Oregon). The DOJ, however, made it clear that the

diversion programs, which are touted on the U.S. Attorney's website as "enhancing a fair and

efficient criminal justice system," will not be offered to any January 6 participant, even though

the DOJ also advertises that, "[e]ach case is subject to individualized review for appropriate

disposition."[53] Individuals who happen to be January 6 participants need not apply.

Upon being hired to represent Chris Carnell, undersigned counsel made numerous

requests for a leniency disposition or a plea to a misdemeanor offense, specifically citing Chris'

age and lack of aggravating factors in this case, and noting that in non-Capitol prosecutions, a

defendant's youthful age usually results in significant leniency during plea bargaining. Counsel

for the Government was adamant that no such leniency factors will be considered and a

---

[53] *Diversion Programs*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (Mar. 3, 2021), originally at
https://www.justice.gov/usao-dc/diversion-programs and now archived at https://web.archive.org/web/
20210321043921/https://www.justice.gov/usao-dc/diversion-programs.

misdemeanor plea for Mr. Carnell was categorically denied. The Government wanted to see him convicted of a felony.

The Government's disparate treatment of the January 6 protesters, as compared to the BLM and various other left-wing protesters — as well as the Government's cherry-picked view on the righteousness of only certain kinds of political riots — provides much-needed context to the otherwise incomparable arrests and sentencing requests for January 6 defendants. Had the federal government treated all riots in the same manner and prosecuted all rioters in the same manner, this sentencing memo would have been a lot more simplistic. But alas, the DOJ has forced this complexity and the extensive argument.

The DOJ's deliberate omission from federal prosecution of the BLM and Kavanaugh protesters is how the Government justifies the claim that January 6 participants could only be compared to other January 6 participants for purposes of criminal penalty imposition. Indeed, there are almost no nonviolent protest cases to compare to the January 6 defendants. That is because the *DOJ caused this disparity* by *only* having prosecuted nonviolent January 6 defendants — by selection, by choice.

As we learned **from the logic of *Wickard v. Filburn*, 317 U.S. 111 (1942), a deliberate decision *not to do something* can create a legally-significant substantial impact through that inaction**. The discussion *supra* illustrates the Government's clear decision not to prosecute various offenses from other political protests which plagued the country in 2020. But as a result, an entire class of politically-motivated criminal defendants was omitted from comparable convictions.

Accordingly, a question can be posed: *does the Government's decision not to charge Kavanaugh protesters under federal law "exert a substantial effect" on the comparable sentencing cases available to this court?* (To borrow phrasing from *Wickard)*. The inevitable answer, as we have explored here, is — yes. *See also United States v. Griffin*, 549 F. Supp. 3d 49, 59 (D.D.C. 2021) ("Disparate charging decisions in similar circumstances may be relevant at sentencing."); *United States v. Sandlin*, 575 F. Supp. 3d 16 (D.D.C. 2021) (citing *Griffin* for the same proposition); *United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021) (same); *United States v. Robertson*, 588 F. Supp. 3d 114 (D.D.C. 2022) (same); *see also* 18 U.S.C. § 3553(a)(6) (directing judges to compare *conduct* as opposed to charges).

The defendant thus asks this Court to take into consideration the defendant's conduct in the context of the Kavanaugh protests of 2018 and the BLM protests of 2020, and the dispositions for those defendants, in order to render a fair sentence.


## D) Comparison of Mr. Carnell to Other January 6 Defendants

Nonviolent January 6 defendants did not walk away with dismissal dispositions after community service, like someone who violently assaulted a federal police officer in Portland; nor was there complete non-prosecution, like for the majority of the D.C.-area BLM protesters who could have been prosecuted for misdemeanor and felony offenses committed in front of the White House but were saved by omission. Instead, January 6 defendants who had been charged with nonviolent offenses have been *convicted* and faced sentences that ranged from probation to jail time.[54]

---

[54] The Government's charting of January 6 sentences is updated bi-weekly and available at: https://www.justice.gov/usao-dc/media/1331746/dl?inline

There are some January 6 cases specifically comparable to that of this defendant which the court should review and consider. The defense also submits to the court cases of more serious conduct on January 6 to consider in determining a fair penalty for Mr. Carnell, as a basis for contextual placement of Mr. Carnell's January 6 conduct. *See* 18 U.S.C. § 3553(a)(6) (directing judges to compare similar records and *similar conduct* at sentencing, as opposed to comparing similar charges).

The defense presents cases showing similar charges, cases showing similar conduct, and cases that help to place Mr. Carnell's participation into context of January 6.

**Matthew Wood**

Matthew Wood had identical charges to those of Mr. Carnell, but his conduct was significantly more egregious. On January 5, "Wood was prepared to sign up to 'raid Congress' and 'be brave heart in that bitch!'  Wood also bragged about being prepared to die and shed blood," according to the Government. *See United States v. Wood*, 1:21-cr-00223-APM, ECF No. 55, *2 (D.D.C. Nov. 7, 2022). He was one of the first protesters to enter the Capitol and one of the last to leave. *Id*. He "incited others to violence" and entered the Capitol through a broken window. *Id*. at *3. He glorified the violence he observed and defended rioting, as well as articulating his specific intent to disrupt the congressional proceedings, according to the Government. *Id*. at *4. Judge Mehta sentenced Mr. Wood to 36 months of probation with a special condition of home detention for 12 of those months.

**Paul Hodgkins**

Paul Hodgkins was one of the first January 6 defendants sentenced for 18 U.S.C. §

1512(c)(2) conduct. His initial charges are very similar to those of Mr. Carnell. *See United States*

*v. Hodgkins*, 1:21-cr-00188-RDM, ECF No. 11 (D.D.C. Mar. 5, 2021). Mr. Hodgkins's conduct

was uneventful inside the Capitol, like that of Mr. Carnell. His guidelines were higher than those

of Mr. Carnell and Mr. Hodgkins was ultimately sentenced to 8 months of imprisonment by

Judge Moss.

**Richard Michetti**

Richard Michetti's indictment is very similar to that of Mr. Carnell. *See United States v.*

*Michetti*, 1:21-cr-00232-CRC, ECF No. 7 (D.D.C. Mar. 19, 2021). His conduct inside the Capitol

was more assertive, however, as it included confronting officers and shouting at officers, "you

are starting a civil war." *See United States v. Michetti*, 1:21-cr-00232-CRC, ECF No. 46, *2

(D.D.C. Aug. 25, 2022). He was proud of his conduct inside the Capitol, as was determined from

text messages. He was sentenced to 9 months of incarceration by Judge Cooper.

**Felicia Konold**

Felicia Konold, who accompanied the Kansas City Proud Boys on January 6, was

sentenced to 45 days of incarceration followed by 24 months of supervised release by Judge

Kelly after pushing bike racks against officers while trying to overpower police guarding the

Capitol, vocally berating police and encouraging other protesters to engage with officers in front

of the Capitol, then entering the Capitol Building. *See United States v. Kuehne et al.*, 1:21-

CR-00160-TJK, ECF No. 239 at *5-7 (Jan. 17, 2024). In the Building, she attempted to hold up a gate with her hands as officers were attempting to close it, and she challenged and shouted insults at the officers. *Id*. at *7-9 After January 6, Ms. Konold celebrated her participation on social media and wrote about her pride in a diary. *Id*. at *9. Ms. Konold was initially charged with 18 U.S.C. § 1512(c)(2), but the charge was dismissed as part of a plea deal to Civil Disorder.

As a reminder, Mr. Carnell was not offered a plea without the inclusion of § 1512(c)(2), the only felony charged in his indictment, despite his culpability being nowhere near that of Ms. Konold's.


### Cory Konold

Cory Konold, who also accompanied the Kansas City Proud Boys, was sentenced to 30 days of incarceration followed by 24 months of supervised release by Judge Kelly, after he pushed bike racks against officers while trying to overpower police guarding the Capitol and entered the Capitol Building— where he stole a Capitol Police helmet and brought it home as a trophy. *See United States v. Kuehne et al.*, 1:21-CR-00160-TJK, ECF No. 239 at *5-9 (Jan. 17, 2024). Cory Konold was initially charged with 18 U.S.C. § 1512(c)(2), but the charge was dismissed as part of a plea deal to Civil Disorder.


### Ronnie Presley

Ronnie Presley both entered the Capitol Building and engaged with officers who were trying to stop rioters from entering. Mr. Pressley is described by the Government as grabbing an

officer's shield and pulling it as the officer guarded the entry doors to the Capitol. *See United States v. Presley*, 1:21-cr-000257-RDM, ECF No. 52 (D.D.C. Nov 18, 2022). Mr. Presley was indicted on 18 U.S.C. § 1512(c)(2), in addition to Civil Disorder and misdemeanor offenses. *See United*  *States v. Presley*, 1:21-cr-000257-RDM, ECF No. 8 (D.D.C. Mar. 26, 2021). The Government dismissed the § 1512(c)(2) felony per a plea deal to Civil Disorder. He received a sentence of 12 months of incarceration and 26 months of supervised release from Judge Moss.

**John Andries**

John Andries was charged § 1512(c)(2) as well as corresponding misdemeanor offenses for entering the Capitol through a broken window one minute after the initial breach and having to be forcibly removed from the Capitol Building by police. *See United States v. Andries*, 1:21-cr-00093-RC, ECF No. 70 (D.D.C. Jan. 10, 2023). Twice during the pendency of his January 6 case, Andries was arrested on new criminal charges in Maryland for assaultive behavior. *Id*. at *2. Andries was sentenced by Judge Contreras on the felony Obstruction count to 12 months and one day of imprisonment, followed by 36 months of supervised release. *See United States v. Andries*, 1:21-cr-00093-RC, ECF No. 76 (D.D.C. Jan. 18, 2023).

**Corinne Montoni**

Corinne Montoni was found guilty of Civil Disorder for entering the Capitol Building and then encouraging the crowd to push back against police officers and also engaging in the collective push against the officers. *United States v. Montoni*, 1:23-cr-00195-RCL, ECF No. 79, *5-10 (D.D.C. Sep. 21, 2023). After being forced to exit the Building, she re-entered the Capitol Building. *Id*. at *10. Ms. Montoni then created a plethora of social media posts describing, celebrating, and defending her conduct. *Id*. at *11-13. She was sentenced by Judge Lamberth to 30 days of incarceration followed by 24 months of supervised release. *United States v. Montoni*, 1:23-cr-00195-RCL, ECF No. 85 (D.D.C. Sep. 28, 2023).

**Daryl Johnson**

Daryl Johnson, a January 6 defendant, was found guilty of civil disorder for rushing a line of law enforcement officers guarding entry to the Capitol Building and helping push through the officers to push open the East Rotunda doors, allowing protesters outside of the Building to storm the Capitol. *United States v. Hazelton*, 1:21-cr-00407-DLF, ECF No. 39 (D.D.C. Jan. 4, 2022). Mr. Johnson was sentenced by Judge Friedrich to 30 days of incarceration and 1 year of supervised release. *United States v. Hazelton*, 1:21-cr-00407-DLF, ECF No. 72 (D.D.C. Jun. 2, 2022).

**James Douglas Rahm, Jr.**

James Rahm was found guilty of § 1512(c)(2) and corresponding misdemeanor charges after a stipulated trial. Prior to entering the Capitol, Rahm posted his understanding of the



congressional proceedings and his corresponding intentions on Facebook:  "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol back." *United States v. Rahm*, Case 1:21-cr-00150-TFH, ECF No. 63, *2 (D.D.C. Jan. 11, 2023). Once inside, Rahm recorded himself stating, "Time to find some brass and kick some friggin' ass." *Id*. He then celebrated interruption of the certification. *Id*. Judge Hogan sentenced Mr. Rahm to 12 months of incarceration and 36 months of supervised release.

**Anthony Puma**

Anthony Puma was charged with 18 U.S.C. § 1512(c)(2), as well as corresponding misdemeanor counts. He was found guilty of the felony Obstruction pursuant to a plea agreement. On December 31, 2020, one week prior to January 6, Mr. Puma wrote on Facebook, "… you never know we might have to start killing some commie bastards. #stopthesteal." *United States v. Puma*, Case 1:21-cr-00454-PLF, ECF No. 55, *2 (D.D.C. Feb. 8, 2023). On January 5, he wrote, "Tomorrow is the big day. Rig for Red. War is coming," and "What time do we storm the House of Representatives?… Hopefully we are storming the House of Representatives tomorrow at 100pm." *Id*. On January 6, he entered the Capitol through a broken window, smoked marijuana inside a senator's office, and made selfie videos boasting about being gassed by police. *Id*. He remained on the grounds of the Capitol until nightfall, and then, two weeks later, made ambiguous threats in online postings to shock the world. *Id*. Judge Friedman sentenced Mr. Puma to 9 months of incarceration and 24 months of supervised release.

**Noah Bacon**

Noah Bacon was charged with identical charges to those of Mr. Carnell, but his conduct was more egregious. He made various statements prior to January 6 supporting the cessation of the certification. Once inside the Capitol Building on January 6, he "unlatch[ed] the cam bolt on the second door, facilitating entry for others lined up to enter [the Senate Gallery]." *United States v. Bacon*, 1:21-cr-00488-CRC, ECF No. 106, *15  (D.D.C. Jul. 14, 2023). He then entered the Senate Gallery from the second floor. *Id*. At his trial, he testified that he did not know that he was in the Senate Gallery, even though he was sitting clearly in the Senate Gallery. *Id*. After he exited the Capitol, his text messages showed support for his actions — "everything is moving perfectly." *Id*. at *18. Judge Cooper sentenced Mr. Bacon to 12 months of incarceration and 24 months of supervised release.

**Leslie Gray**

Leslie Gray entered the Capitol after yelling, "We elected Donald James Trump as the President. . . and we demand that he be installed on January 20th as the next president." See *United States v. Gray*, 1:22-cr-00338-DLF, ECF No. 56, *5  (D.D.C. Sep. 21, 2023). She pushed forward, yelling "we're breaching the doors," and entered through breached doors of the Capitol. *Id*. at *6. Once inside, she said,  "I am in Congress. This is our house. This is our house! …I don't know what we are doing now but we are in here. We've taken it. We've taken it. This is our house," and yelled "traitor" at police officers she passed. *Id*. at *6-7. She then physically forced her way past police officers who were attempting to stop her from entering a corridor. As she defiantly pushed past officers, Gray yelled, "step aside! I am going in… this is our house… I am

coming in. Damn right I am coming in." *Id*. at *7. She was then forcibly removed by another

officer after defiantly declining his verbal commands to exit. *Id*. at *8. Afterwards, she posted

messages of pride in her actions. *Id*. at *9. Judge Friedrich sentenced Ms. Gray to 12 months and

1 day of incarceration with 12 months of supervised release.


### Bruno Cua

Bruno Cua, who was 18 at the time of the offense, was found guilty of 18 U.S.C. §

1512(c)(2) and 18 U.S.C. § 111(a)(1) at a stipulated bench trial. "Cua rushed into the Senate

Gallery, jumped down to the Senate Floor, and sat in the Vice President's chair with his feet up

on the desk," according to the Government. *United States v. Cua*, 1:21-cr-00107-RDM, ECF No.

328, *2 (D.D.C. May 5, 2023). The Government sought a high-guidelines sentence, "because of

the significant aggravating factors present in this case, including Cua's possession of weapons,

his violent pre-attack rhetoric, his use and threatened use of violence on January 6, and his

encouragement and direction of other rioters, including his pivotal role in opening the Senate

Chamber to other rioters." *Id*. At his sentencing hearing, Mr. Cua admitted to unbolting the door

to the Senate, which resulted in the flow of protesters into the Senate Chamber. *United States v.

Cua*, 1:21-cr-00107-RDM, ECF No. 373, *65-66 (D.D.C. Aug. 15, 2023).

Judge Moss found that Mr. Cua "was principally responsible for the breaching of the

Senate Chamber." *United States v. Cua*, 1:21-cr-00107-RDM, ECF No. 373, *85 (D.D.C. Aug.

15, 2023). And, that Mr. Cua had "very disturbing" social media posts. *Id*. at *86. And, that Mr.

Cua committed an assault, albeit a less egregious one. *Id*. at *87. Judge Moss then granted a

downward variance based on Mr. Cua's age at the time of the offense. *Id*. at *88 ("your youth

and immaturity is a factor that I do need to consider, along with your lack of criminal history

and, I think, your genuine remorse"). "I have to balance the seriousness of what you did that day

with your age, immaturity, remorse, and other factors on the other side of the balance," Judge

Moss stated, before sentencing Mr. Cua to 1 year and 1 day in prison and 36 months of

supervised release. *Id*. at *91.


### Katharine Morrison and Tara Aileen Stottlemyer

Katharine Morrison pleaded guilty pursuant to a plea agreement to 18 U.S.C. § 1512(c)

(2). *United States v. Shalvey, Et. Al.*, 1:21-cr-00334-TJK, ECF No. 72, (D.D.C. Oct. 3, 2022).

Ms. Morrison entered the Capitol through the Senate Wing door and then moved to various areas

within the Building, including the Crypt, the House's Suite, the Rotunda and the Senate

Chamber. Inside the Senate Chamber, Ms. Morrison and her co-defendants looked through

Senators' desks, and took pictures of documents that were

in and on those desks. **Ms. Morrison and her co-**

**defendants were some of the individuals who were**

**inside the Senate Chamber at the same time as Mr.**

**Carnell and his co-defendant.** It appears that Mr.

Carnell's brief conversation was with one of Ms.

Morrison's co-defendants. Judge Kelly sentenced Ms. Morrison to 8 months of incarceration

followed by 24 months of supervised release. One of her co-defendants, Tara Aileen Stottlemyer,

charged with the same, also received an identical sentence.

**E) Comparison of Mr. Carnell's Case to a BLM Case with a Similar Sentencing Guideline**

In Naperville, Illinois, Christian Rea intentionally threw a firework at a group of police officers at a BLM protest in June of 2020.[55] Several officers suffered injuries as a result of his assault on police, but Mr. Rea was only charged with one count of Civil Disorder. *See United States v. Rea,* Case: 1:20-cr-00316, ECF No. 55, *3 (N.D. Ill. Dec 15, 2021). This charging decision led to a Guidelines Level of 10, with a Sentencing Range of 6-12 months. *Id. at* *6. According to the District Judge's findings at sentencing, "Mr. Rea threw a lit commercial firework toward a group of police officers during a protest, resulting in several serious injuries, including one officer having *permanent hearing loss*."[56] (Emphasis added). Mr. Rea was ultimately sentenced to 12 months for what he did to those officers.

Chris Carnell's Sentencing Guidelines, as calculated by the defense, call for a sentence of 6-12 months, the same guideline range as was calculated for Mr. Rea. Considering the nature of Mr. Carnell's actions in the context of the *Rea* case facts, Chris Carnell's culpability is much lower. As compared to Mr. Rea, who injured multiple officers by throwing an explosive device at them, one permanently, Chris Carnell injured no one and was peaceful even while his presence was unlawful. Mr. Carnell's conduct never posed the direct level of danger to human life and safety that was posed by the actions of Mr. Rea. The sentences of the two men should proportionately reflect the nature of their actions. Accordingly, Mr. Carnell's penalty should be lower than that of Mr. Rea.

---

[55] Press Release, *Man Sentenced to a Year in Federal Prison for Throwing Incendiary Device at Police in Chicago Suburb,* UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS (May 25, 2022), https://www.justice.gov/usao-ndil/pr/man-sentenced-year-federal-prison-throwing-incendiary-device-police-chicago-suburb.

[56] *Letter from Hon. Thos. M. Durkin, U.S. Dist. J., to U.S. Sentencing Comm'n* (May 25, 2022), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20221017/judge-durkin.pdf.

## F) The Government's Sentence Request in Context

The Government's sentence request of 18 months imprisonment for Mr. Carnell is incongruent with the January 6 sentences described *supra* and with the dispositions of other riot cases. Firstly, Mr. Carnell's behavior is nowhere near as egregious as most of the defendants described above, who received 12 month sentences or lower. Secondly, Mr. Carnell's conduct is similar to that of grown adult defendants Katharine Morrison and Tara Aileen Stottlemyer, who were in the Senate Chamber around the same time as Mr. Carnell, and who received 8-month sentences of imprisonment. Thirdly, Mr. Carnell was 18 years old at the time of his offense and not fully matured. As Judge Moss discussed in the case of Bruno Cua, the age of 18 at the time of the offense and subsequent remorse and maturation should play a strong role in determining appropriate penalty. Accordingly, Mr. Carnell's penalty, to be compliant with 18 U.S.C. § 3553, would need to be lower than that of the Morrison and Stottlemyer defendants, lower than 8 months of imprisonment. Mr. Carnell's sentence should also be lower than that of Mr. Wood, *see* p. 45, *supra*.

The Government disregards Mr. Carnell's age at the time of the offense in arguing for a penalty, but the science of brain development is settled in this field. Mr. Carnell was not fully developed and not fully matured back then. His statements to probation prove this very point.

In comparing cases it is also important to note that Mr. Carnell did not praise his conduct after January 6 like many of the other January 6 participants, despite his immature age; he instead stayed quiet. Mr. Carnell has since concentrated on his schoolwork and on becoming a productive member of society.

## VI. APPROPRIATE SENTENCE FOR THIS DEFENDANT

Considering Christopher Carnell's clean record, his age at the time of the offense and his maturation since the offense, his genuine regret and remorse, and the facts of his case in light of other January 6 cases *and* the Government's position on and treatment of the pre-January 6 protest cases, a fair penalty — in addition to the already-imposed penalty of multiple convictions — is one year of probation.

The sentence proposed by the defense is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), and within the limitations placed on this Court by Congress and the Eighth Amendment.

> Respectfully submitted,
> By Counsel:
> _____/s/_____
> Marina Medvin, Esq.
> *Counsel for Defendant*
> MEDVIN LAW PLC
> 916 Prince Street
> Alexandria, Virginia 22314
> Tel:  888.886.4127
> Email: contact@medvinlaw.com

## CERTIFICATE OF SERVICE FOR CM/ECF

I hereby certify that on June 3, 2024, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.

